**UNITED STATES of America, Appellee,**

v.

**Myung Ho KIM, also known as Roberto, Defendant–Appellant.**

**Docket No. 98–1706.**

United States Court of Appeals, Second Circuit.

Argued May 26, 1999.

Decided Oct. 8, 1999.

---

568

Paul B. Radvany, Assistant United States Attorney, New York, New York (Mary Jo White, United States Attorney for the Southern District of New York, Jamie L. Kogan, Assistant United States Attorney, New York, New York, on the brief), for Appellee.

Maranda E. Fritz, Fritz & Miller, New York, New York, for Defendant-Appellant.

Before: KEARSE, MINER, and POOLER, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Myung Ho Kim appeals from an amended judgment entered in the United States District Court for the Southern District of New York following a jury trial before Jed S. Rakoff, *Judge,* convicting him on one count of knowingly harboring an alien who was unlawfully present in the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) (1994). Departing downward from the sentence prescribed by the 1995 version of the Sentencing Guidelines ("Guidelines" or "1995 Guidelines"), which was applicable to Kim, the court sentenced Kim principally to a three-month term of imprisonment, to be followed by a two-year term of supervised release. On appeal, Kim challenges his conviction on the grounds, *inter alia,* that § 1324 was improperly applied to him because the trial evidence showed at most that he knowingly employed an alien who possessed no proper documentation, and that such conduct does not constitute harboring within the meaning of § 1324. Kim contends also that his Guidelines-recommended sentence was improperly calculat-

ed. Finding no basis for reversal, we affirm.

## I. BACKGROUND

Beginning in late 1995, Kim owned Sewing Masters, Inc. ("Sewing Masters"), a New York City garment-manufacturing business. The present prosecution arose out of investigations conducted by the United States Immigration and Naturalization Service ("INS") of Sewing Masters and its predecessor company in 1995–1997. As a result of those investigations, Kim was charged with three counts of concealing, harboring, or shielding from detection three illegal aliens, including Wilson Mendez and Nancy Farfan, from January 1996 through April 1997, knowing that they lacked legal alien status. Kim was convicted only of harboring Farfan. The government's proof at trial, as it related principally to the charge of harboring Farfan, was presented primarily through the testimony of Mendez, Farfan, and several INS agents. Taken in the light most favorable to the government, the evidence included the following.

Mendez testified that he entered the United States illegally in 1988 and remained in unlawful status until December 1997. Prior to 1995, he was employed by the predecessor of Sewing Masters as a machine operator. When Kim became the owner of the business, he promoted Mendez to a managerial position and instructed him to consult an attorney, paid for by Kim, to "find a way to make [his] papers." (Trial Transcript ("Tr.") 56.) Mendez obtained work authorization in December 1997. In the meantime, Kim paid him "[o]ff the books." (Tr. 67.)

In late 1995 or early 1996, Kim showed Mendez a list of other alien employees who reportedly lacked work authorization, and he instructed Mendez to fire each person on the list. Mendez relayed the terminations, but some of the fired employees nonetheless continued to report to work. As to those illegal aliens who continued to work, Kim instructed Mendez to "tell them

if they want to stay, tell them to bring new papers, . . . papers with different name[s] on [them]." (Tr. 61.) Kim added, "don't you ever tell them I told you to tell them that, because if Immigration finds out I can go to jail." (Tr. 61–62.) One of the employees to whom Mendez relayed those instructions was Farfan.

In May 1996, Kim showed Mendez a letter from the INS indicating that several Sewing Masters employees, including Mendez, had submitted invalid documents in connection with their employment (the "1996 suspect-document list"). Kim did not fire Mendez but instructed Mendez to fire the other employees whose names appeared on the list. After Mendez relayed those terminations, again some of the fired employees continued to report to work. As to those who stayed, Kim told Mendez that they should "change their names again." (Tr. 64.) Mendez relayed the message to several workers, among them Farfan.

Farfan, a native of Ecuador, testified that she entered the United States illegally in 1993 and was never granted work authorization. She was hired by Sewing Masters's predecessor after submitting false immigration documents, which listed her true name and a false social security number. Before Kim became the owner of the business, Farfan's responsibilities had included collecting other employees' immigration and work documents and filling out their Employment Eligibility Verification forms ("I–9" forms). Farfan retained those job functions after Kim became the owner.

In late 1995 or early 1996, shortly after Mendez's first efforts to fire certain employees, Farfan observed Mendez engage in a discussion with Kim, at the conclusion of which Mendez instructed Farfan to collect "green cards and Social Security cards for everybody, including those who were going to use a different name." (Tr. 185–86.) Farfan collected the documents, copied them, and submitted them to Kim, who

reviewed the copies with her. At Kim's direction, Farfan then completed new I–9 forms for all workers who had submitted documents bearing new names, including herself. She also indicated on an internal document how the new names corresponded to the old. Farfan's own new documents were made out in the name "Nancy Ortiz." Farfan informed Kim that Ortiz was her husband's name when Kim asked why she had chosen that name.

In April 1996 Farfan also completed, at Kim's direction, an INS-supplied "Employer Eligibility Verification Form Investigative Inspection Worksheet" (the "INS worksheet") for 83 employees, which would thereafter be submitted to the INS. Kim instructed Farfan to indicate on the worksheet that "Nancy Farfan no longer existed there." (Tr. 203.) Accordingly, Farfan listed "Nancy Ortiz," social security number 142–10–1145, as having been hired on January 8, 1996, and listed "Nancy Farfan," social security number 152–90–8342, as having been terminated on January 12, 1996.

A week after that INS worksheet was submitted to the INS, Kim received from the INS the 1996 suspect-document list, and he informed Farfan that the name "Nancy Ortiz" was on it. Farfan testified that Kim then asked her "why didn't I try to get my papers in order." (Tr. 207.) When she asked for Kim's assistance in doing so, he replied that he would help her after helping Mendez but that in the interim she could no longer work under the name "Nancy Ortiz". Farfan inquired whether she would "have to change [her] name all over again," and Kim suggested that she get her papers "fixed." (Tr. 208.) When Farfan pursued the question of whether she would "have to use another name," Kim replied, "it's possible" (*id.*) and eventually nodded affirmatively (Tr. 209).

Farfan then worked with Kim and Mendez to collect and copy new documents from all of the employees who continued to work at Sewing Masters despite being on the 1996 suspect-document list. Farfan purchased new counterfeit documents for herself in the name "Blanca Ortiz" and filled out a new I–9 form in that name. She was thereafter paid as "Blanca Ortiz".

INS agents testified to their investigations of Sewing Masters and its predecessor. Special Agent Paul Scrivanich testified that he had prepared the 1996 suspect-document list and served it on Kim; that list indicated Scrivanich's findings that the identification numbers provided for Mendez, Farfan, and "Nancy Ortiz," among others, were invalid. Kim was required to pay a civil fine of $1,857 for employing the persons listed on the 1996 suspect-document list.

Special Agent Ernst Florvil described an April 1997 "reinspection" of Sewing Masters during which Kim was asked to produce, *inter alia,* I–9 forms for all employees who had worked at Sewing Masters at any time since April 1996. (Tr. 468.) The materials submitted by Kim did not include a form in the name of Nancy Farfan; they included a form for "Blanca Ortiz."

In his defense case, Kim called as a witness a well-known attorney with a long history of government service, who testified that he had been retained by a garment industry businessman to bring some of the latter's suppliers, including Sewing Masters, "into compliance with the immigration law." (Tr. 609.) In connection with that mission, the attorney met Kim in 1997 and found Kim to be cooperative.

Three counts charging Kim with concealing, harboring, or shielding from detection Farfan, Mendez, and one other employee, knowing that they lacked legal alien status, were submitted to the jury, which deliberated for two days and then reported that it was unable to reach a unanimous verdict. After being given an *Allen* charge (*Allen v. United States,* 164 U.S. 492, 501–02, 17 S.Ct. 154, 41 L.Ed. 528 (1896)), the jury found Kim guilty of

harboring Farfan and found him not guilty on the other two counts.

Calculating Kim's sentence in accordance with the 1995 Guidelines, as described in greater detail in Part II.C. below, the district court found that the prescribed imprisonment range for his offense was 8–14 months. The court departed downward from that range and sentenced Kim to three months of imprisonment, to be followed by two years of supervised release.

## II. DISCUSSION

On appeal, Kim contends principally (1) that the government could not properly prosecute him under 8 U.S.C. § 1324 and should at most have charged him with violating 8 U.S.C. § 1324a (1994), a provision that deals expressly with employers and provides less severe penalties than § 1324; (2) that his conduct with respect to Farfan did not constitute harboring within the meaning of § 1324; and (3) that the district court miscalculated the range of imprisonment prescribed by the Guidelines. We reject these contentions for the reasons discussed below.

Kim also contends that he was the victim of selective prosecution and that the district court's instructions to the jury were erroneous because they allowed the jury to convict him merely on the basis of reckless disregard, rather than actual knowledge, of his alien employees' illegal status. We have considered these contentions and have found them meritless. They do not warrant discussion.

### A. *Applicability of § 1324 to Employers*

■ Section 1324 of Title 8 of the United States Code, entitled "Bringing in and harboring certain aliens," prescribes a prison term of up to five years and/or a fine in accordance with Title 18 of the Code, see 18 U.S.C. § 3571(b)(3) (1994) (for an individual convicted of a felony, up to $250,000), for "[a]ny person" who,

knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien.

8 U.S.C. § 1324(a)(i)(A)(iii) (1994); *see also id.* § 1324(a)(1)(B)(i) (Supp. III 1997) (effective September 30, 1996, increasing to 10 years the maximum prison term if the harboring in violation of § 1324(a)(i)(A)(iii) was "done for the purpose of commercial advantage or private financial gain"). Where there is such knowledge or reckless disregard of the alien's unlawful status, § 1324(a)(i)(A)(iii) encompasses a defendant's "conduct tending substantially to facilitate [the] alien's remaining in the United States illegally." *United States v. Lopez,* 521 F.2d 437, 441 (2d Cir.) (internal quotation marks omitted) (construing predecessor section, *see* 8 U.S.C. § 1324(a)(3) (1970) (reaching any person who "willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection ... any [illegal] alien")), *cert. denied,* 423 U.S. 995, 96 S.Ct. 421, 46 L.Ed.2d 368 (1975). In *Lopez,* we concluded that the defendant's conduct, which included providing illegal aliens with housing, transportation, and sham marriage ceremonies, and assisting them in obtaining employment, was meant to "facilitate the continued unlawful presence of the aliens in the United States, which amounts to harboring." 521 F.2d at 441.

Section 1324a of Title 8, which Kim contends is the only section under which he could properly be prosecuted, is entitled "Unlawful employment of aliens." Section 1324a imposes on an employer the obligations to refrain from knowingly employing an alien who is unauthorized to work in the United States, *see* 8 U.S.C. § 1324a(a), and to verify, under penalty of perjury, that before hiring a given individual the employer examined identification documents such as a passport or resident alien

card and concluded that those documents reasonably appeared to be genuine, see id. § 1324a(b)(1). Section 1324a authorizes the government to, inter alia, prosecute employers who have engaged in a pattern or practice of such violations; the criminal sanctions prescribed by § 1324a, other than injunctions, are limited to fines of up to $3,000 per alien and/or imprisonment for not more than six months for the entire unlawful pattern or practice. See id. § 1324a(f).

█ Although Kim contends that, as an employer, he could properly be prosecuted only under § 1324a and hence subject only to the lesser penalties prescribed by that section rather than those found in § 1324, we reject his contention for two principal reasons. First, § 1324, on its face, does not restrict the persons within its reach. It applies to "[a]ny person" who, inter alia, knowingly harbors an illegal alien. Thus, while §§ 1324 and 1324a plainly are not coextensive, given that § 1324a applies only to employers and imposes documentation verification requirements that are not found in § 1324, § 1324 appears on its face to reach some of the conduct covered by § 1324a. As a general matter, the fact that Congress has enacted two sections encompassing similar conduct but prescribing different penalties does not compel a conclusion that one statute was meant to limit, repeal, or affect enforcement of the other. Statutes may "overlap" or enjoy a "partial redundancy," United States v. Batchelder, 442 U.S. 114, 118, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979), and yet be "fully capable of coexisting," id. at 122, 99 S.Ct. 2198. We see nothing in the language of these two sections to preclude their coexistence.

Second, the evolution of § 1324(a)(i)(A)(iii) to its present form makes clear that Congress intended it to cover employers. Both § 1324a and the current version of § 1324(a)(i)(A)(iii) were adopted in 1986 as part of the Immigration Reform and Control Act of 1986 ("IRCA"), see Pub.L. No. 99–603, §§ 101, 112(a), 100 Stat. 3359, 3360–74, 3381–82 (1986). IRCA was a major immigration reform initiative designed to "deter aliens from entering [the United States] illegally." H.R.Rep. No. 99–682(I), at 46 (1986) ("House Report"), reprinted in 1986 U.S.C.C.A.N. 5649, 5650. Describing "[e]mployment [a]s the magnet that attracts aliens here illegally," the House Report stated that the purpose of the legislation was

> to close the back door on illegal immigration so that the front door on legal immigration may remain open. The principal means of closing the back door, or curtailing future illegal immigration, is through employer sanctions.
>
> .... Employers will be deterred by the penalties in this legislation from hiring unauthorized aliens and this, in turn, will deter aliens from entering illegally or violating their status in search of employment.

Id. See also NLRB v. A.P.R.A. Fuel Oil Buyers Group, Inc., 134 F.3d 50, 55–56 (2d Cir.1997); Montero v. INS, 124 F.3d 381, 384 (2d Cir.1997). IRCA introduced § 1324a, a new section directed toward that goal, targeting only employers.

IRCA also expanded the scope of § 1324, allowing it too to reach employers. Prior to the passage of IRCA, § 1324(a), which was enacted in 1952 and remained unchanged until 1986, prohibited a person from, inter alia, "willfully or knowingly conceal[ing], harbor[ing], or shield[ing] from detection, or attempt[ing] to conceal, harbor, or shield [an illegally present alien] from detection," 8 U.S.C. § 1324(a)(3) (1982); but that pre–1986 version of § 1324 also contained a proviso stating that "for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring." 8 U.S.C. § 1324(a) (1982) (emphasis added). Thus, prior to IRCA, routine employment practices in hiring illegal aliens were expressly excluded from § 1324's prohibition against harboring. In § 112(a) of IRCA, Congress amended § 1324 to

eliminate that exclusion. The legislative history expressly confirms that, in order to "modify the existing law" and "expand the scope of activities proscribed," House Report at 65, 1986 U.S.C.C.A.N. at 5669 (discussing § 112 of the bill), the amendment to § 1324 was included "to eliminate [the] proviso[ ] which prevents employment from being considered as harboring an alien," *id.* at 94, 1986 U.S.C.C.A.N. at 5698 (discussing § 112 of the bill).

Thus, after the 1986 amendment, § 1324 no longer excluded employment from the prohibition against harboring. The present version of § 1324, which is sufficiently broad on its face to encompass the knowing or reckless harboring of illegal aliens by employers, was plainly intended to have that breadth.

■ The fact that employers are also targeted by § 1324a provides no support for Kim's contention that he should have been prosecuted under § 1324a, for "when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." *United States v. Batchelder,* 442 U.S. at 123–24, 99 S.Ct. 2198. "[A] defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution." *Id.* at 125, 99 S.Ct. 2198; *see United States v. Zyskind,* 118 F.3d 113, 118 (2d Cir. 1997); *United States v. Bilzerian,* 926 F.2d 1285, 1300 (2d Cir.), *cert. denied,* 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991). Kim has not shown discrimination here. Thus, while the government could have elected to prosecute Kim under § 1324a, the fact that it chose to pursue him under § 1324 provides him no basis for complaint.

### B. *"Harboring"*

Kim also contends that, even if he could be prosecuted under § 1324, the conduct that was proven at trial was insufficient to constitute harboring. We disagree.

■ As discussed in Part II.A. above, harboring, within the meaning of § 1324, encompasses conduct tending substantially to facilitate an alien's remaining in the United States illegally and to prevent government authorities from detecting his unlawful presence, *see, e.g., United States v. Lopez,* 521 F.2d at 440–41. Such facilitation may be attempted through a wide range of conduct. In *Lopez,* we noted a number of such acts, including providing unlawful aliens with housing, transportation, and sham marriage ceremonies, and assisting them in obtaining employment. In *United States v. Smith,* 112 F.2d 83, 84 (2d Cir.1940), we upheld the conviction of an employer under a 1917 precursor to § 1324, *see* 8 U.S.C. § 144 (1940) (reaching "[a]ny person ... who ... shall conceal or harbor or attempt to conceal or harbor ... any [illegal] alien"), where the defendant had instructed undocumented aliens that, if questioned, they should deny that they were aliens and say that they were from New York State. We concluded that this constituted "harbor[ing]," for the employees were thus "sheltered from the immigration authorities and shielded from observation to prevent their discovery as aliens." 112 F.2d at 85. *See also United States v. Herrera,* 584 F.2d 1137, 1145 (2d Cir.1978) (installation of security systems designed to alert illegal aliens to impending INS on-site inspections and facilitate their escape constitutes harboring); *United States v. Fierros,* 692 F.2d 1291, 1295 (9th Cir.), *cert. denied,* 462 U.S. 1120, 103 S.Ct. 3090, 77 L.Ed.2d 1350 (1983) (use of radio scanners tuned to border patrol frequency in vehicles used to transport illegal aliens into the United States constitutes conspiracy to harbor).

In the present case, the evidence at trial, viewed in the light most favorable to the government, was sufficient to establish both (a) that Kim knew or recklessly disregarded Farfan's status as an alien who was not authorized to work or remain in the United States, and (b) that he took steps designed to help her remain in his employ,

undetected by the INS. The proof of Kim's knowledge included the evidence that Farfan, using her real name, was among the persons Kim initially instructed Mendez to fire because they were believed to be illegal aliens; that, in allowing Farfan nonetheless to remain an employee, Kim asked Farfan why she had chosen "Ortiz" as her first substitute surname; that Farfan's real name and her first substitute name, "Nancy Ortiz," appeared on the INS's 1996 suspect-document list; that that list, which indicated that neither Farfan nor "Nancy Ortiz" was in possession of a valid social security number, was served personally on Kim; and that Kim and Farfan spoke several times about her lack of work authorization. This evidence, along with Kim's statement to Mendez that if the employment scheme were discovered by the INS Kim could go to jail, was ample to permit the jury to infer that Kim had knowledge of Farfan's status as an illegal alien.

The evidence was also sufficient to permit the inference that Kim attempted to prevent Farfan's continued presence from being detected by the authorities. In addition to the evidence just described, Farfan testified that Kim instructed her to report falsely to the INS that after "Nancy Ortiz" was hired the employment of Nancy Farfan was terminated; and she testified that Kim later instructed her to obtain false documentation and to submit an I-9 form similarly attempting to mislead the INS to believe that "Nancy Ortiz" had been terminated and "Blanca Ortiz" had been hired in her place. The jury was entitled to credit Farfan's testimony, which was ample to support an inference beyond a reasonable doubt that Kim had attempted to facilitate Farfan's continued unlawful presence and prevent her detection by the INS. Accordingly, we see no basis for disturbing Kim's conviction of harboring.

## C. *Sentencing Challenges*

Calculating Kim's sentence under the 1995 version of the Guidelines, the district court increased his offense level by two steps pursuant to § 2L1.1(b)(2) on the ground that Kim had harbored more than six aliens; and it rejected Kim's contention that he had not harbored Farfan for profit, a contention which, if correct, would have entitled him under § 2L1.1(b)(1) to a three-step offense-level reduction. Kim challenges the sufficiency of the evidence to support these rulings.

 Disputed facts relevant to sentencing need be proven only by a preponderance of the evidence. *See, e.g., United States v. Concepcion,* 983 F.2d 369, 388 (2d Cir.1992), *cert. denied,* 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993). In reviewing a sentence, we are required to give due regard to the opportunity of the sentencing judge to assess the credibility of the witnesses, to "accept the findings of fact of the district court unless they are clearly erroneous and [to] give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e) (1994). "Thus, the sentencing court's findings as to what acts were performed, what was said[ and] what the speaker meant by his words ... will be upheld unless they are clearly erroneous," *United States v. Fernandez,* 127 F.3d 277, 283 (2d Cir.1997), and we will not overturn a sentencing court's application of the Guidelines to the facts before it absent an abuse of discretion, *see, e.g., id.; United States v. Santiago,* 906 F.2d 867, 871 (2d Cir.1990). Applying these principles in the present case, we see no basis for reversal.

### 1. *Harboring Six or More Aliens*

 The 1995 version of the Guidelines, under which Kim was sentenced, provided for a two-step increase in offense level if the offense involved the harboring of between six and 24 aliens. *See* Guidelines § 2L1.1(b)(2)(A) (1995). In response to Kim's contention that there was no evidence that he had harbored as many as six aliens, the district court held a *Fatico* hearing. Following that hearing, the court found that Kim's "basic modus operandi

when dealing with illegal alien employees that he wished to retain was to direct or otherwise undertake to have them change their names," thus either violating § 1324 or attempting to do so, and that Kim had followed that course "with more than six employees." (Sentencing Transcript ("Sent.Tr.") 56–57.) These findings were easily supported by the evidence.

In addition to the evidence presented at trial, the government presented testimony by Mendez and Farfan at the *Fatico* hearing. Consistently with his trial testimony, Mendez testified that Kim had directed him to tell various employees that in order to remain employed at Sewing Masters they must change their names. Mendez testified that he relayed that change-of-name instruction to "[a]bout ten" employees. (Sent. Tr. 4.) Mendez named eight of those employees, not including Farfan, at the *Fatico* hearing; at trial he had testified that he also relayed the change-of-name instruction to Farfan. In addition, Farfan testified at the hearing that she had observed Mendez issue such instructions to at least seven employees; she named those seven, including one employee whose name had not been mentioned in Mendez's testimony. In all, therefore, the witnesses identified, by name, a total of 10 illegal aliens who had been instructed to change their names and provide false documentation in order to remain employed by Kim's company.

Kim's contention that he himself did not know most of the harbored employees' names, did not give the change-of-name instructions to them directly, and did not know the number of illegal aliens who would change their names because they "refused to be fired" (Kim brief on appeal at 31–32), is immaterial. The district court was entitled to credit the testimony that, in instructing at least 10 employees to change their names and obtain new documentation, Mendez was relaying instructions from Kim. Plainly, the evidence supported the court's finding that Kim di-

rected the harboring of more than six illegal aliens.

### 2. *"Other Than for Profit"*

We are also unpersuaded by Kim's contention that the district court erred in refusing to reduce his offense level pursuant to § 2L1.1(b)(1) on the theory that Kim had not harbored Farfan for profit. Preliminarily, we note that the parties disagree as to which side has the burden of proof with respect to whether harboring was or was not for profit (a question that has not been resolved by this Court, *see, e.g., United States v. Krcic*, 186 F.3d 178, 182 n.6 (2d Cir.1999) (declining to reach that question; but noting that the burden of proving entitlement to an offense-level decrease usually rests on the defendant)). The district court did not find it necessary to decide the burden-of-proof question in this case; nor do we, for we conclude that even if the burden was on the government, a preponderance of the evidence showed that Kim harbored Farfan for profit within the meaning of the 1995 version of the Guidelines.

The 1995 Guidelines provided that, for a defendant convicted under § 1324, the court was to decrease the offense level by three steps "[i]f the defendant committed the offense other than for profit." Guidelines § 2L1.1(b)(1) (1995). The 1995 Guidelines commentary stated, with an exception not applicable here, that " '[f]or profit' means for financial gain or commercial advantage . . . ." Guidelines § 2L1.1 Application Note 1 (1995). *See also* 8 U.S.C. § 1324(a)(1)(B)(i) (Supp. III 1997) (effective September 30, 1996, doubling to 10 years the maximum prison term for violation of § 1324(a)(1)(A)(iii) if the harboring was "done for the purpose of commercial advantage or private financial gain"); *cf. id.* § 1324(a)(2)(B)(ii) (1994) (providing 10–year maximum prison term if offense of bringing illegal alien to United States in violation of § 1324(a)(2) was "done for the purpose of commercial advantage or private financial gain"). The

phrases "commercial advantage" and "financial gain" are not defined in the statute or the Application Notes, but their meanings are hardly arcane. The usual meaning of "commercial," for example, is "relating to commerce," or "from the point of view of profit: having profit as the primary aim," *Webster's Third New International Dictionary* 456 (1976), while "advantage" signifies a "benefit, profit, or gain of any kind," *id.* at 30.

Applying the usual meaning of the language used in the 1995 Guidelines commentary, the district court found that Kim had not harbored Farfan other than for profit:

> If a businessman ... makes a decision such as the one he did with respect to Ms. Farfan, a decision to direct her to falsify a document, a decision to do so in connection with the running of his business, one would think that it's a simple, common sense inference that he's doing it for a business reason, lawful or unlawful business reason, but a business or profit-motivated reason.

(Sent. Tr. 42.) The court stated that the evidence

> strongly supports the view that [Kim] was a hard-nosed business person who had devised, in effect, what he thought was a better mousetrap, a way, through name change, of maintaining illegal employees in a way that simply churning them would not achieve.

(*Id.* at 56.) The evidence that Kim had relied on Farfan to assist him in running his business consisted principally of Farfan's testimony describing her job duties at Sewing Masters, which included review of new employees' social security cards and green cards, the execution of employer verifications to be submitted to the INS, and the day-to-day handling of employee time cards for payroll purposes. Some of these administrative tasks were obviously necessary to the running of any business, and Farfan's performance of certain of these duties sometimes had an unusually direct impact on Kim's profit: Farfan testified that on one occasion Kim scolded her for having made an error on an employment verification form submitted to the INS, telling her that her mistake had cost him $500. Farfan was experienced in performing her administrative duties, having had those responsibilities before Kim acquired the company, and she was plainly a trusted employee, for when Kim traveled outside of the country, Mendez and Farfan were left in charge.

There was no evidence that Kim had harbored Farfan out of any feelings of charity or affection, or that he had any motive other than the profitability of his business. We conclude that the evidence was sufficient to support the court's finding that Kim retained Farfan as a valued managerial employee and that he did so only for commercial advantage.

Kim's challenge to the court's finding, however, takes a different tack. Kim contends that the interpretation of "for profit" as encompassing a goal of "commercial advantage" or "financial gain" is too broad. In support of that contention, he relies on the 1998 version of the Guidelines, which incorporated amendments to § 2L1.1 and its commentary that became effective on May 1, 1997. *See* Guidelines Appendix C, Amendment 543 (1997). Following the 1997 amendments, § 2L1.1(b)(1) continued to provide for a three-step offense-level reduction if the offense was committed "other than for profit," Guidelines § 2L1.1(b)(1) (1998); but the 1997 amendments deleted the 1995 commentary definition of " '[f]or profit' " as "for financial gain or commercial advantage," Guidelines § 2L1.1 Application Note 1 (1995), and substituted the statement that " 'other than for profit' means that there was no payment or expectation of payment" for the harboring, *id.* Application Note 1 (1998). Although we agree with Kim that the government did not present evidence that Kim received or expected to receive payment for harboring Farfan, we are unpersuaded that the 1998 commentary was applicable to him.

In order to avoid an *ex post facto* problem, Kim was sentenced under the 1995 Guidelines, which were in effect during most of the period of his offense and in which § 2L1.1(b)(2) (setting base offense level at nine and requiring a two-step increase for harboring 6–24 aliens) was more favorable to him than the corresponding provision of the 1998 Guidelines, *see* Guidelines § 2L1.1(b)(2) (1998) (setting base offense level at 12 and requiring a three-step increase for harboring 6–24 aliens). *See generally United States v. Adeniyi*, 912 F.2d 615, 618 (2d Cir.1990) (court is to apply the version of the Guidelines in effect at the time of sentencing unless there is an *ex post facto* problem). Since "[a] version of the sentencing guidelines is to be applied in its entirety," and the "sentencing court has no authority to pick and choose, taking one provision from an earlier version of the guidelines and another from a later version," *United States v. Keller*, 58 F.3d 884, 890 (2d Cir. 1995), the 1998 version of the § 2L1.1(b)(1) commentary is not directly applicable to Kim.

A defendant sentenced under one version of the Guidelines may, however, be given the benefit of a later revision if the revision represents not a substantive change but merely a clarification of the Sentencing Commission's prior intent. *See, e.g., United States v. Colon*, 961 F.2d 41, 45 (2d Cir.1992); *United States v. Hewitt*, 902 F.2d 1082, 1084 n. 1 (2d Cir. 1990) (per curiam). Frequently when the language of a guideline or its commentary is altered, the Commission states its intent in making the change. In such an instance, the Commission's characterization of the alteration as a clarification, rather than a change in substance, is accorded considerable deference. *See, e.g., United States v. Mapp*, 990 F.2d 58, 61 (2d Cir. 1993); *United States v. Joyner*, 924 F.2d 454, 458 (2d Cir.1991); *United States v. Guerrero*, 863 F.2d 245, 250 (2d Cir.1988).

The 1997 amendments to § 2L1.1 were not accompanied by any statement that the Commission intended the change in Application Note 1 simply as a clarification. *See* Guidelines Appendix C, Amendment 543 (1997). Instead, the amendments made numerous changes in the guideline and its commentary, and the Commission characterized the changes, in bulk, as "implement[ing] section 203 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. 104–208, 110 Stat. 3009–566, which directs the Commission to amend the guidelines for offenses related to smuggling, transporting, or harboring illegal aliens." Guidelines Appendix C, Amendment 543 (1997). We see nothing in this statement to suggest that the Commission amended Application Note 1 merely to clarify the Commission's original intent.

Further, on its face, the 1997 change to Application Note 1 appears to effect a substantial change in scope rather than to clarify. Plainly, a "commercial advantage" may encompass more than a simple "payment or expectation of payment." Had it been the Sentencing Commission's original intent that the "for profit" concept be restricted narrowly to payment or expectation of payment, we doubt that the Commission would have chosen to express that restriction in terms so broad as "commercial advantage."

In the circumstances, we are persuaded that the 1998 Guidelines reflect a substantive change to § 2L1.1 Application Note 1 rather than a clarification. Accordingly, the district court properly declined to construe the 1995 version of § 2L1.1(b)(1) as entitling a defendant to a reduction in offense level where he received a commercial advantage other than payment or the expectation of payment.

We see no clear error in the district court's factual finding that Kim harbored Farfan for commercial advantage, and we see no abuse of discretion in its refusal to apply § 2L1.1(b)(1) to him.

CONCLUSION

We have considered all of Kim's contentions on this appeal and have found in them no basis for reversal. The judgment of the district court is affirmed.