UNITED STATES of America,
Appellee,

v.

Marco G. FIORE, Jr.; Benjamin V. Salmonese, Jr.; Frank Piscitelli; Thomas Deceglie; Peter C. Restivo; David C. Lavender; Michael J. Eisemann; Michael Ricottone; Howard Zelin; Glen Benussi, Defendants,

Thomas J. DeSimone, Defendant–Appellant.

No. 02–1473.

United States Court of Appeals,
Second Circuit.

Argued: Aug. 27, 2003.

Decided: Aug. 23, 2004.

Bobbi C. Sternheim, New York, New York, for Defendant–Appellant.

David B. Anders, Assistant United States Attorney (David N. Kelley, United States Attorney, and Andrew B. Ceresney, Assistant United States Attorney, of counsel), New York, New York, for Appellee.

Before: WINTER, CALABRESI, and KATZMANN, Circuit Judges.

WINTER, Circuit Judge.

Thomas J. DeSimone appeals from the sentence imposed following a guilty plea before Judge Kaplan. On December 17, 2001, DeSimone pleaded guilty to three counts of a superseding indictment charging him with conspiring to commit securities fraud, wire fraud, and commercial bribery, in violation of 18 U.S.C. § 371 (1994) (Count One); securities fraud, in violation of 15 U.S.C. §§ 77q(a) and 77x and 18 U.S.C. § 2 (Count Two); and perjury, in violation of 18 U.S.C. § 1621 (Count Four). He argues on appeal that the district court erred: (i) in enhancing his sentence for obstruction of justice; (ii) in making remarks reflecting ethnic stereotyping; and (iii) in improperly ordering restitution. We affirm.[1]

## BACKGROUND

DeSimone was charged with involvement in a stock manipulation scheme in

---

1. The mandate in this case will be held pending the Supreme Court's decision in *United States v. Booker,* No. 04–104 (to be argued October 4, 2004). Should any party believe

which the trading price of certain securities was inflated by fraud. Nationwide Securities, Inc. underwrote initial public offerings by two corporations, Gaylord Companies, Inc. and Thermo–Mizer Environmental Corp. After their offerings in 1995 and 1996 respectively, both Gaylord and Thermo–Mizer began trading publicly on the NASDAQ Small–Capitalization Market System. Nationwide acted as an aftermarket "market maker" for the securities, and used its licensed brokers, including DeSimone, to fraudulently manipulate the demand for, and price of, the common stock and warrants in aftermarket trading.

The scheme involved a cornucopia of securities laws violations. Nationwide's principals and brokers retained undisclosed control over substantial positions in the warrants by placing them in the names of nominees and offshore corporations prior to the dates of the offerings. The nominees held the warrants subject to undisclosed arrangements in which DeSimone and the other codefendants controlled the timing and disposition of the warrants and retained all or a portion of the proceeds from their sale. The scheme operated from a "boiler room," the brokers typically making hundreds of telephone calls each day involving the use of fraudulent sales pitches to solicit purchases of the securities through Nationwide. The calls created a demand for the securities, enabling DeSimone and the other codefendants to sell them through the nominees at the fraudulently inflated prices. As a result, DeSimone and his cohorts obtained illegal profits of approximately $2.0 million.

The scheme also included making undisclosed payments to DeSimone and other brokers to sell the particular securities to retail clients, conditioning purchases in the offerings on aftermarket purchases, making unauthorized trades in customer accounts, failing to execute sell orders in a timely fashion or only when sales could be paired with purchases, and fraudulently using DeSimone's registered representative number in selling securities in order to conceal the identity of certain brokers. In exchange for the use of his number, DeSimone received securities from the offerings, which he placed in nominee accounts at Nationwide held in the names of his mother, grandmother, and sister-in-law.

The SEC conducted a civil investigation into Nationwide in connection with the Gaylord and Thermo–Mizer offerings. In the course of that investigation, DeSimone denied under oath any knowledge of his mother's account at Nationwide or of her trading in Thermo–Mizer warrants. He also denied having allowed others to use his broker's license. These statements were known by DeSimone to be false.

On December 17, 2001, pursuant to a plea agreement, DeSimone entered a guilty plea to three counts charging him with conspiracy to commit securities fraud, wire fraud and commercial bribery (Count One), securities fraud (Count Two), and perjury (Count Four). The probation office's presentence report suggested a two-level enhancement not in the plea agreement for obstruction of justice based on his perjury before the SEC. The presentence report also detailed DeSimone's financial condition, recommended no fine,

---

there is a need for the district court to exercise jurisdiction prior to the Supreme Court's decision, it may file a motion seeking issuance of the mandate in whole or in part. Although any petition for rehearing should be filed in the normal course pursuant to Rule 40 of the Federal Rules of Appellate Procedure, the court will not reconsider those portions of its opinion that address the defendant's sentence until after the Supreme Court's decision in *Booker*. In that regard, the parties will have until fourteen days following the Supreme Court's decision to file supplemental petitions for rehearing in light of *Booker*.

but did recommend restitution. DeSimone's sentencing took place during two proceedings. At the first proceeding the district court deferred its restitution determination and found that the obstruction enhancement applied to DeSimone. At the second proceeding the district court sentenced DeSimone to a 21–month term of imprisonment to be followed by three years of supervised release. The district court also ordered restitution to the victims of the fraud in the amount of $742,060.63 and imposed a $250 special assessment.

## DISCUSSION

a) *The Obstruction of Justice Enhancement*

■■■ DeSimone first challenges the district court's inclusion of a two-level ob-

struction of justice enhancement pursuant to Section 3C1.1 of the Sentencing Guidelines.[2] "The imposition of an obstruction-of-justice enhancement is subject to a mixed standard of review." *United States v. Brown*, 321 F.3d 347, 351 (2d Cir.2003). We review *de novo* the sentencing court's interpretation of the Sentencing Guidelines but review its related findings of fact only for clear error. *United States v. Crisci*, 273 F.3d 235, 240 (2d Cir.2001).

The district court grouped DeSimone's perjury offense with his underlying fraud offense, using the fraud as the base offense level, and then enhanced that by two levels for the perjury.[3]

DeSimone does not challenge the district court's grouping of the obstruction offense, in this case perjury, with the underlying

---

**2.** The presentence report applied the November 1, 1997 version of the Guidelines to DeSimone, and the parties appear to use this version in their briefs. *See* Appellant's Br. at 9 (using the 1997 language of Section 3C1.1); Appellee's Br. at 19 & n.*. However, DeSimone's sentence is governed by the 2001 Guidelines. *See* U.S.S.G. § 1B1.11(a); *United States v. Reinoso*, 350 F.3d 51, 56 (2d Cir. 2003) ("Section 1B1.11(a) of the Guidelines provides that '[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced,' .... Because [defendant] was sentenced in October 2002, the district court applied the 2001 version ....''). It seems the district court correctly used the Guidelines in effect at the time it sentenced DeSimone. We therefore refer to the provisions and corresponding commentary of the more recent manual.

In any event, even if the district court had used the 1997 version of the Sentencing Guidelines, we could still consider subsequent versions to the extent that amendments clarify the prior version. *See United States v. Gonzalez*, 281 F.3d 38, 46 (2d Cir.2002) ("When an amended version of a guideline represents only a clarification by the Sentencing Commission of the original version rather than a substantive change, the amended version is to be applied."); *United States v. Kim*, 193 F.3d 567, 578 (2d Cir.1999) ("A defendant sen-

tenced under one version of the Guidelines may ... be given the benefit of a later revision if the revision represents not a substantive change but merely a clarification of the Sentencing Commission's prior intent."). The commentary to the 1998 amendment that DeSimone focuses on to challenge the obstruction enhancement, *see infra*, expressly characterizes the amendment as "clarify[ing] ... the obstruction of justice guideline," U.S.S.G. app. C., amend. 581, and it therefore may be considered. *See Kim*, 193 F.3d at 578 ("Frequently when the language of a guideline or its commentary is altered, the Commission states its intent in making the change. In such an instance, the Commission's characterization of the alteration as clarification, rather than a change in substance, is accorded considerable deference.").

**3.** Application Note 3 to Guidelines Section 2J1.3—the section covering perjury offenses—provides:

> In the event that the defendant is convicted under this section as well as for the underlying offense (*i.e.*, the offense with respect to which he committed perjury, subornation of perjury, or witness bribery), see the Commentary to Chapter Three, Part C (Obstruction), and to § 3D1.2(c) (Groups of Closely Related Counts).

offense, in this case fraud, under Section 3D1.2(c).[4] Application Note 5 to Section 3D1.2 explains that:

> [s]ubsection (c) provides that when conduct that represents a separate count, *e.g.* .... obstruction of justice, is also a specific offense characteristic in or other adjustment to another count, the count represented by that conduct is to be grouped with the count to which it constitutes an aggravating factor. This provision prevents "double counting" of offense behavior .... [A] count such as obstruction of justice, which represents a Chapter Three adjustment and involves a different harm or societal interest than the underlying offense, is covered by subsection (c) ....

U.S.S.G. § 3D1.2 cmt. n. 5. The Application Note gives the following example: "If ... [a] bribe was given for the purpose of hampering a criminal investigation into the offense, it would constitute obstruction and under § 3C1.1 would result in a 2–level enhancement to the offense level for the fraud. Under [these] circumstances, the counts would be grouped together." *Id.* The district court found that, like the bribery in the example, DeSimone's perjury constituted obstruction under Section 3C1.1.

Application Note 8 to Section 3C1.1 then directs that the offense level calculated pursuant to the underlying offense, here fraud, be enhanced by two levels for obstruction of justice, and that the resulting offense level applies unless the offense level for the obstruction offense, here perjury, is greater. *See supra* note 2.

The offense level for DeSimone's fraud offense before application of the obstruction of justice enhancement was sixteen, and the offense level for his perjury under Section 2J1.3 was less than the fraud offense level plus the two-level obstruction enhancement. *See* U.S.S.G. § 2J1.3. Accordingly, the district court used the fraud offense level of sixteen and added two levels for DeSimone's obstruction of justice, leading to an offense level of eighteen. It then reduced the offense level by three points for acceptance of responsibility resulting in a final offense level of fifteen.

DeSimone advances two arguments in challenging the obstruction of justice enhancement. First, he argues that because his perjury was committed in an SEC civil investigation and before the initiation of the criminal investigation, the perjury did not constitute an obstruction of the investigation into the underlying fraud offense, and, therefore, the enhancement is inapplicable. Second, he argues that the enhancement results in double-counting, improperly punishing him

---

U.S.S.G. § 2J1.3 cmt. n. 3. Application Note 8 to section 3C1.1 in turn states that:

> If the defendant is convicted both of an obstruction offense ... and an underlying offense (the offense with respect to which the obstructive conduct occurred), the count for the obstruction offense will be grouped with the count for the underlying offense under subsection (c) of § 3D1.2 (Groups of Closely Related Counts). The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2–level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater.

U.S.S.G. § 3C1.1 cmt. n. 8.

4. Section 3D1.2 provides in pertinent part that

> [a]ll counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:
>
> \* \* \* \* \* \*
>
> (c) [w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

U.S.S.G. § 3D1.2(c).

for conduct already taken into consideration by his perjury conviction. We disagree.[5]

■ DeSimone's first argument—that perjury in the civil investigation did not constitute an obstruction of the investigation into his fraud offense—relies on the following language of Section 3C1.1:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1 (emphasis removed).

DeSimone contends that the perjury did not occur "during the course of the investigation, prosecution, or sentencing of the instant offense of conviction" within the meaning of Section 3C1.1. *Id.* According to the Commentary, the quoted language "instructs that the obstruction must relate either to the defendant's offense of conviction (including any relevant conduct) or to a closely related case" and "also clarifies the temporal element of the obstruction guideline (*i.e.*, that the obstructive conduct must occur during the investigation, prosecution, or sentencing of the defendant's offense of conviction)." U.S.S.G. app. C., amend. 581 (2001).

We see nothing in the Guidelines language or in the Commentary that undermines the district court's conclusion. It is undisputed that DeSimone perjured himself in an SEC investigation involving the precise conduct for which he was criminally convicted: conspiracy to commit securities fraud and securities fraud. His false denial of any knowledge of his mother's account at Nationwide, her purchase of Thermo–Mizer warrants, or Nationwide's use of his trading license went to the heart of his role in the underlying fraudulent scheme.

Where federal administrative and prosecutorial jurisdiction overlap, subsequent criminal investigations are often inseparable from prior civil investigations, and perjury in the prior proceeding necessarily obstructs—if successful, by preventing—the subsequent investigation. Securities fraud is a proper subject of both administrative and criminal investigations, and whether the administrative enforcement officials proceed before, after, or simultaneously with criminal prosecutors is often determined by fortuitous circumstances regarding possession of particular evidence, available resources, and legal issues, such as statutes of limitation. Moreover, there is no general rule preventing the SEC's sharing of evidence acquired through civil discovery with criminal prosecutors. *SEC v. Dresser Indus.*, 628 F.2d 1368, 1385 (D.C.Cir.1980) (en banc) ("Both the '33 Act and the '34 Act—and other statutes related to securities law enforcement as well—expressly authorize the SEC to transmit such evidence as may be available * * * to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings . . . .") (internal quotation marks and citations omitted; alteration in original). SEC enforcement officials and prosecutors all expect coordination at some investigative level and perceive the various proceedings as integral to each other. A subject of the investigations will also view each as a different facet of one problem. For example, a subject who decides upon perjury in an SEC proceeding will do so

---

**5.** Our discussion of course applies only to the Guidelines' enhancement and not necessarily to the substantive crime of obstruction of justice.

principally because the goal is to avoid all liability or criminal liability in particular.

Moreover, DeSimone's argument is contrary to the caselaw of this and other circuits. In *United States v. Zagari*, 111 F.3d 307, 328 (2d Cir.1997), we addressed a Section 3C1.1 enhancement based on a sentencing court's finding that the defendant had perjured himself in a separate, civil action. Though we remanded for findings on the materiality of the perjury to the federal offense, we stated that where "the connection between the two cases is quite close ... perjury in the civil action could constitute obstruction of justice in the instant federal offense." *Id.*[6] *See also United States v. McGovern*, 329 F.3d 247, 252 (1st Cir.2003); *United States v. Barry*, 938 F.2d 1327, 1335 (D.C.Cir. 1991).

■ DeSimone's argument that the two-level enhancement results in double counting for the perjury offense is also without merit. DeSimone's sentence was calculated using the underlying fraud count as the base. Absent the two-level obstruction enhancement, the sentence would not have reflected DeSimone's perjury. As noted, the district court properly grouped the underlying (fraud) and obstruction (perjury) offenses under Section 3D1.2(c), applied the appropriate offense level for fraud, and adjusted upward by two levels for the perjury. As the Seventh Circuit observed in *United States v. Maggi*, 44 F.3d 478, 482 (7th Cir.1995), "this formula ensures the two-point enhancement does not constitute 'double-counting.' ... [because] when closely related counts are grouped under section 3D1.2(c), the offense level used is that for the most serious counts." The court explained that:

> Here, the money laundering count was the most serious, and therefore, the court applied its offense level. The court's subsequent two-point upward adjustment for obstruction of justice did not constitute double counting because it was used to enhance only this money laundering offense level. Had the obstruction of justice count(s) called for an offense level higher than the money laundering count (plus the two-point enhancement), [the Application Note] provides that the obstruction base level would have applied, without the enhancement. This section of the Guidelines, as clarified by [the Application Note], was therefore crafted to avoid double counting for obstruction of justice.

cmt. n. 2. The court reasoned that "[t]he conduct upon which the district court enhanced [defendant's] sentence did not obstruct the investigation or prosecution of the instant offense, rather it obstructed the administration of justice with respect to the FTC civil proceedings." *Id.* Thus, in *Tankersley* the defendant's obstructive conduct—*i.e.*, continuing violations of the civil injunction—did not impair the investigation or prosecution of the offense on which he was charged—*i.e.*, contempt—but obstructed only the unrelated civil fraud action. In contrast, the obstruction enhancement in the present case is not based upon conduct designed to obstruct an investigation or prosecution of a separate, underlying obstruction-related offense.

---

**6.** DeSimone's reliance on *United States v. Tankersley*, 296 F.3d 620 (7th Cir.2002) is misplaced. The defendant in *Tankersley* pled guilty to two counts of criminal contempt for violations of a preliminary injunction entered in a civil fraud suit brought by the Federal Trade Commission. *Id.* at 621. The court rejected a Section 3C1.1 obstruction enhancement based on the continuing violations of the injunction because Application Note 2 to Section 2J1.2, the obstruction of justice Guideline—which is analogous to Application Note 2 to Section 2J1.3, the perjury Guideline at issue here—provides that Section "3C1.1 does not apply 'unless the defendant obstructed the investigation or trial of the obstruction count.'" *Id.* at 624 (quoting U.S.S.G. § 2J1.2, cmt. n. 2); *see also* U.S.S.G. § 2J1.3

*Id.* (emphasis removed); *see also* U.S.S.G. § 3D1.2 cmt. n. 5.

b) *Ethnic Considerations in Sentencing*

] DeSimone's second challenge on appeal concerns remarks of the district court during sentencing that, in his view, "cast aspersions on DeSimone's ethnic heritage and require resentencing." Appellant's Br. at 10. The remarks were references by the court to a television series, *The Sopranos.* DeSimone argues that because the principal subject matter of *The Sopranos* is a modern-day, Italian–American, organized-crime family, the references infected, or appeared to have infected, the sentence imposed on DeSimone, an Italian–American. We disagree.

The first reference to *The Sopranos* occurred during an oral argument on DeSimone's pretrial motion for severance; DeSimone's counsel stated that "the statements alleged to be perjurious are fairly narrow in that they refer to [DeSimone's] relationship with his mother, which I believe opens up a whole other issue at trial." In response, the prosecution argued:

> In this case defendant Fiore was charged with making false statements to the U.S. Attorney's office in a proffer session concerning his ownership interest in Nationwide Securities as well as his earning of excessive compensation in connection with the IPO transactions that are the crux of the case here. In the case of Mr. DeSimone, he is charged with making false statements concerning not his relationship with his mother, not some abstract—

The district court interrupted:

> So this isn't The Sopranos?

To which the prosecution replied:

> This is not The Sopranos, no. These were not false statements made concern-

ing some aspect of his relationship that was wanting.

The second reference to *The Sopranos* occurred during the July 29, 2002 sentencing proceeding. The district court stated:

> The defendant will please rise for the imposition of sentence. Mr. DeSimone, this was an outrageous fraud. I've said that to the other defendants, I say it to you. It was a classic boiler room operation as you well know. It looks like a bad episode out of *The Sopranos,* albeit without anybody getting hurt physically. It was despicable, and I don't know what else to say about it. Not only that, but you lied about it when the time came. I understand from what I've been told that previous to this episode you were not a bad guy, and I've been here long enough to know that you're probably not in all respects a bad guy now. Human nature is that way. Even people who do terrible things have other aspects to their personalities, to their lives, that are perfectly okay and often commendable. But somehow, you lost your moral compass here in a very serious way and I can't condemn that enough.

It is not seriously disputed that the court's first reference to *The Sopranos* was to a theme of the series concerning the difficult relationship between the principal character and his mother or that the second reference was to a particular episode that portrayed a boiler-room operation similar, save for acts of violence, to the one in which DeSimone was involved.

However, DeSimone argues that, because the television series does focus on criminals of Italian descent, the court's remarks indicate that his ethnicity was, or appears to have been, a basis for his sentence, thus violating a clear rule of law. *See United States v. Leung,* 40 F.3d 577, 586 (2d Cir.1994) (We have "reject[ed] the view that a defendant's ethnicity or nation-

ality may legitimately be taken into account in selecting a particular sentence" and have held that "even the appearance that the sentence reflects a defendant's race or nationality will ordinarily require a remand for resentencing.").

However, we see nothing in the court's remarks that went beyond a reference to two plotlines in *The Sopranos* that are ethnicity-neutral. Difficult relationships between children and parents and the operation of boiler rooms for purposes of securities fraud are not commonly associated with a single ethnic group, and no reasonable person—even one who might be highly critical of the television series on ethnic-stereotyping grounds—would believe that the court was making an ethnicity-based remark.[7]

Moreover, where a defendant's "sentence [i]s within the Guidelines range [it] can be vacated only upon a showing that his [ethnic origin], rather than individual, distinctive aspects of his character or the offense, dictated" the sentence. *United States v. Jacobson*, 15 F.3d 19, 23 (2d Cir.1994).

The district court in the present case made very plain the individual and distinc- tive aspects of DeSimone's character and his crimes that were the basis for the sentence imposed. It explained in detail the impropriety of the acts and admonished DeSimone for participating in "an outrageous fraud" involving "a classic boiler room operation as you well know" in which "you lost your moral compass . . . in a very serious way and I can't condemn that enough." Furthermore, the district court highlighted DeSimone's dishonest and obstructive conduct in perjuring himself as compounding the wrongfulness of his actions: "It was despicable, and I don't know what else to say about it. Not only that but you lied about it when the time came." The district court's discussion with respect to sentencing in the instant case thus focused exclusively on individual, distinctive, and ethnically neutral aspects of DeSimone's character and his crimes.

### c) *Imposition of Restitution*

DeSimone's final claim is that the district court failed to consider required factors under the Mandatory Victim Restitution Act ("MVRA"), *see* 18 U.S.C. § 3664(f)(2), before imposing the order of restitution.[8] "We review a restitution or-

---

**7.** This case is therefore clearly distinguishable from those cases where a district court's statements gave the appearance that a sentence was affected by the defendant's ethnicity because the court highlighted ethnicity or nationality in its remarks. *See Leung*, 40 F.3d at 585 (remanding for resentencing where district court stated: "The purpose of my sentence here is to punish the defendant and to generally deter others, particularly others in the Asiatic community because this case received a certain amount of publicity in the Asiatic community . . . if people want to come to the United States they had better abide by our laws."); *United States v. Edwardo–Franco*, 885 F.2d 1002, 1005–06 (2d Cir.1989) (remand for resentencing was ordinary remedy where district court stated: "[Colombians] don't have too much regard for Judges. They only killed 32 Chief Judges in that nation.

Their regard for the judicial system, the men who run their laws, I'm glad I'm in America. That's why I pledge allegiance to the flag.").

**8.** We examine this claim under the MVRA, which applies to cases where the defendant is convicted on or after April 24, 1996. *See Antiterrorism and Effective Death Penalty Act of 1996*, Pub.L. No. 104–132 § 211, 110 Stat. 1214, 1241 (1996); *see also United States v. Kinlock*, 174 F.3d 297, 299 n. 2 (2d Cir.1999). Although most of the offensive conduct in this case preceded the MVRA's effective date, the required factors that must be considered before imposing restitution are the same as those contained in the MVRA's predecessor, 18 U.S.C. § 3664(a), *Kinlock*, 174 F.3d at 299–300 n. 2; *United States v. Ismail*, 219 F.3d 76, 78 (2d Cir.2000); *United States v. Jacques*, 321 F.3d 255, 260 (2d Cir.2003), and

der for abuse of discretion." *United States v. Lino,* 327 F.3d 208, 210 (2d Cir. 2003). DeSimone's failure to object to the restitution order at sentencing does not create a bar to appellate review "because improperly ordered restitution constitutes an illegal sentence amounting to plain error." *United States v. Thompson,* 113 F.3d 13, 15 (2d Cir.1997).

█ The relevant section of the MVRA requires district courts imposing restitution to consider three factors: "(A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled; (B) projected earnings and other income of the defendant; and (C) any financial obligations of the defendant; including obligations to dependents." 18 U.S.C. § 3664(f)(2). DeSimone's claim rests solely on his argument that the district court did not make express statements on the record indicating that it considered the MVRA factors. *See*

Appellant's Br. at 14–17. Even if we believed that the district court failed in this regard—and we do not—DeSimone's argument is barred by a recent decision of this court.

In *United States v. Walker,* 353 F.3d 130, 134–35 (2d Cir.2003), we stated that "[t]he only question we address is whether the sentencing judges must state on the record that they have considered the factors, on pain of remand. We now abandon that requirement." Therefore, "in considering restitution sentences imposed under MVRA, we will not vacate and remand ... solely by reason of the sentencing judge's failure to indicate consideration of the mandatory factors." *Id.* at 134. There is nothing in the present record to indicate that the district court failed to consider the factors contained in the MVRA in ordering DeSimone's restitution. Indeed, the district court's order is thoughtful and carefully calibrated to meet DeSimone's circumstances.[9]

therefore no *ex post facto* issue arises. Alternatively, the fact that the conspiracy continued into June 1996, also leads to application of the MVRA. *See United States v. Boyd,* 239 F.3d 471, 472 (2d Cir.2001) ("[A] sentencing court may constitutionally apply the MVRA to orders of restitution for defendants whose conspiracies began before, but ended after, the MVRA's effective date."). Moreover, the parties themselves analyze the issue under the MVRA. *See* Appellant's Br. at 14–15; Appellee's Br. at 31.

9. After stating that DeSimone is to "pay restitution in the aggregate amount of $742,060.63 to the individuals listed on the appendix that will be affixed to your judgment in proportion to their respective losses," the district court set forth an elaborate payment schedule that varied from the recommendation of the presentence report:

> Restitution shall be paid in monthly installments commencing on the first day of the second month following your release from the term of imprisonment imposed hereby. Each monthly installment shall be the sum of the earned income amount and the other income amount. For purposes of this judg-

ment, earned income means salary, wages, commissions and any other compensation for personal services. Other income means all revenues received by you or for your account that are not earned income. Earned income amount means ten percent of your earned income up to and including three thousand dollars for the preceding month plus 20 percent of the amount of your earned income in excess of three thousand dollars but not in excess of five thousand dollars for the preceding month plus 30 percent of the amount of your earned income in excess of five thousand dollars but not in excess of nine thousand dollars for the preceding month, plus 50 percent of your earned income in excess of nine thousand dollars for the preceding month. The term other income amount means 90 percent of your other income for the preceding month. No further payments shall be required of you after the entire aggregate amount has been paid by all the defendants sentenced in this case.

The schedule reflects an evaluation of DeSimone's projected earnings and directs payments based on shifting percentages depend-

## CONCLUSION

The judgment of the district court is affirmed.

ing on the level of DeSimone's future income. Furthermore, the terms of the schedule—10% of an income under $3000—indicate that the district court took into consideration DeSimone's living expenses, itemized in the presentence report as monthly expenses of $2,526.

Finally, the district court's consideration of DeSimone's financial resources and assets is evident by the fact that payment was ordered to begin only a month after DeSimone would be released, thus predicating the restitution not on DeSimone's current assets but instead on his future earning capacity.