[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 17, 2002
THOMAS K. KAHN
CLERK

No. 01-15551

D. C. Docket No. 00-00038 CR-1-MMP

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

CHANG QIN ZHENG,
ZHENG WEI ZHENG,
JIN SHUANG ZHENG,
a.k.a. Shuang Jin Zheng,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Florida

**(September 17, 2002)**

Before DUBINA, BARKETT and KRAVITCH, Circuit Judges.

DUBINA, Circuit Judge:

A jury found Appellees Chang Qin Zheng ("Chang"), Zheng Wei Zheng ("Zheng"), and Jin Shuang Zheng, a.k.a. Shuang Jin Zheng ("Jin"), guilty of conspiring to conceal, harbor, and shield from detection aliens in buildings and motor vehicles for the purpose of commercial advantage and private financial gain, knowing and in reckless disregard of the aliens' illegal status, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), (a)(1)(A)(v)(I), and (a)(1)(B)(i). The jury also found the Appellees guilty of the substantive crimes of concealing, harboring, and shielding from detection certain named illegal aliens for commercial advantage and private financial gain, knowing and in reckless disregard of the aliens' illegal status, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), (a)(1)(A)(v)(II), and (a)(1)(B)(i). After trial, the district court granted a Motion for Judgment of Acquittal as to all Appellees. The Government appeals, and we reverse.

## BACKGROUND

In 1989, Chang illegally entered the United States but became a legal permanent resident in 1995. His wife, Jin, had previously entered the United States in 1984 on a tourist visa and reported to the Immigration and Naturalization Service ("INS") as an illegal alien. Jin became a legal permanent resident in 1996. In 1993, Jin's brother, Zheng, entered the United States with false documents. Authorities arrested Zheng, but the INS issued him an employment authorization.

In 1997, the INS rescinded his employment authorization and ordered Zheng deported. Zheng, however, never left the United States.

In 2000, the Federal Bureau of Investigation ("FBI") in Gainesville, Florida, and the INS in Jacksonville, Florida, began investigating complaints that three people who were operating two Chinese restaurants in Gainesville – the China Super Buffet and the New China Restaurant – were allegedly employing illegal Chinese and Central American immigrants. The FBI and INS conducted joint surveillances from March until July 2000. In one surveillance, authorities observed ten to fifteen Asian and Hispanic individuals outside Zheng's house at 1707 South Williston Road, Gainesville, Florida. These men and women were dressed identically, wearing white shirts, black vests, and pants. In another surveillance, authorities saw approximately ten Asian and Hispanic individuals outside Zheng's house enter two vehicles, a red Plymouth registered to Chang and a tan Honda registered to Zheng. Thirty minutes later, authorities saw these same individuals working in the China Super Buffet.

On another occasion, authorities observed ten or eleven workers arrive at the China Super Buffet in either the red Plymouth or the tan Honda. On April 28, 2000, authorities videotaped four individuals leave Chang and Jin's home in Chang's red Plymouth and drive to the China Super Buffet. Later that same day,

authorities saw Zheng working the cash register at the China Super Buffet. When an officer paid for the meals, Zheng accepted the money and made change but failed to ring up the sale on the cash register.

On June 16, 2000, Alachua County Deputy Sheriff Steven Maynard ("Deputy Maynard") responded to a disturbance call at Zheng's residence. Upon arrival, Deputy Maynard observed what appeared to be two Hispanic males jump a chain link fence in the back yard of the residence and flee. Three other individuals at the residence complained to Deputy Maynard that they disputed their wages with their employers. Authorities later discovered that two of the complaining individuals were illegal aliens. Looking inside the residence, Deputy Maynard saw between ten and twenty persons of Asian and Hispanic heritage. Deputy Maynard knocked on the door and Zheng appeared. Zheng admitted to Deputy Maynard that he was an illegal alien and stated that he was the manager of the Super China Buffet.

Chang, Jin, and their two children arrived shortly thereafter at Zheng's residence. Chang and Jin escorted Deputy Maynard around the house and explained that they employed the occupants of the house at their restaurants. Deputy Maynard noticed that some of the rooms were sparsely furnished with barrack-like accommodations. Several of the occupants admitted to Deputy

4

Maynard that they were illegal aliens. In addition, Chang admitted to Deputy Maynard that he knew that some of his employees were illegal aliens.[1]

On July 27, 2000, investigators executed search warrants at the China Super Buffet, the New China Restaurant, and at the Appellees' residences. Investigators located one illegal alien in Zheng's home and recovered numerous business documents, including invoices for both restaurants, billing records, blueprints, and a contractor's estimate for renovations to the China Super Buffet. Investigators also recovered fifteen to twenty credit cards in Zheng's name and a total of $13,585 in cash in the trunk of his Honda. At Chang and Jin's home, investigators recovered various documents and located one illegal alien. At the two restaurants, the investigators recovered business records, financial records, cash, illegal aliens, business cards, and an INS order directing Zheng to report for deportation on May 10, 2000. Investigators discovered that eighteen of the twenty-two employees at the restaurants were illegal aliens.

Investigators presented the evidence to the Government, who then charged the Appellees with violating 8 U.S.C. § 1324(a)(1)(A)(iii), (a)(1)(A)(v)(I), (a)(1)(A)(v)(II), and (a)(1)(B)(i). At trial, various employees testified about their

---

[1] Chang cannot speak English, but his son, who does speak English, interpreted his father's words to Deputy Maynard.

working and living arrangements. These employees stated that they lived in Zheng's house without paying rent and that they worked at the restaurants, on average, twelve hours a day, six days a week. Most of the restaurants' employees, if not all, lacked proper authorization documents. Some employees testified that Chang and Zheng never requested to see identifying information. Additionally, the employees testified that Chang and Zheng paid them in cash, an average monthly salary between $900 and $1900. The Government also proffered evidence showing that the Appellees failed to pay Social Security and federal taxes for these employees, either from the employees' earnings or from the required employer payments. Further, the Appellees failed to make unemployment compensation payments required under Florida state law. The Government also proved that Appellees infrequently filed tax returns and when they did file, they greatly under-reported the number of employees, the amount of wages paid to employees, their personal income, and their business income. Despite failing to pay their taxes, Appellees wired more than $200,000 in cash to China.

**ISSUES**

1. Whether the district court erred in granting the Appellees' Motion for Judgment of Acquittal after the jury found the Appellees guilty of violating 8 U.S.C. § 1324(a)(1)(A)(iii), (a)(1)(A)(v)(I), (a)(1)(A)(v)(II), (a)(1)(B)(i).

2. Whether the district court erred by failing to enter a judgment of conviction on the lesser included offense proscribed in 8 U.S.C. § 1324(a)(1)(A)(iii), (a)(1)(B)(ii).[2]

## STANDARD OF REVIEW

This court applies "the same standard used in reviewing the sufficiency of the evidence" to a district court's grant of a Judgment of Acquittal. *United States v. Ward*, 197 F.3d 1076, 1079 (11th Cir. 1999). This court does not defer to the district court's decision, but views the evidence in the light most favorable to the Government, resolving any conflicts in the evidence in favor of the Government. *Id.* "The court must ascertain whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.*

## DISCUSSION

---

[2] Because we reverse the district court's order granting Judgments of Acquittal and reinstate the Appellees' convictions, we decline to discuss this issue.

The Government charged the Appellees with various violations of 8 U.S.C.

§ 1324(a)(1)(B)(i).  Section 1324 provides, in pertinent part:

**§ 1324.  Bringing in and harboring certain aliens**

**(a) Criminal penalties**

(1)(A) Any person who –
    (i) knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;
    (ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;
    (iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;
    (iv) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or
    (v)(I) engages in any conspiracy to commit any of the preceding acts, or
    (II) aids or abets the commission of any of the preceding acts, shall be punished as provided in subparagraph (B).
(B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs –
    (i) in the case of a violation of subparagraph (A)(i) or (v)(I) or in the case of a violation of subparagraph (A) (ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage

or private financial gain, be fined under Title 18, imprisoned not more than 10 years, or both . . . .

8 U.S.C. § 1324(a)(1)(A)(i)-(v), (a)(1)(B)(i) (1999).

In its order granting the Appellees' Judgments of Acquittal, the district court concluded that the Government failed to prove beyond a reasonable doubt that the Appellees harbored the illegal aliens for the purpose of commercial advantage or private financial gain. In reaching this conclusion, the district court evaluated the Government's evidence and considered the legislative history and the dearth of case law discussing this statute. The district court determined that the Government did not present sufficient evidence from which a rational jury could conclude beyond a reasonable doubt that the Appellees were guilty of the charged offenses. The district court further concluded that neither the legislative history nor the case law supported the Government's charges against the Appellees. We disagree.

The Appellees contend that, at most, the Government should have charged them with § 1324a only, which imposes on the employer obligations to refrain from knowingly employing an alien who is unauthorized to work in the United States and to verify, under penalty of perjury, that before hiring a given individual, the employer examine identification documents and conclude that those documents reasonably appear to be genuine. 8 U.S.C. § 1324a(a), (b)(1). Section 1324a authorizes the Government to prosecute employers who have engaged in a pattern

9

or practice of violating these obligations.  The criminal sanctions prescribed for a violation of § 1324a are much less stringent than those prescribed for a violation of § 1324.[3]

In considering this appeal, we first examine the language of the statute at issue.  "As with any question of statutory interpretation, we begin by examining the text of the statute to determine whether its meaning is clear." *Lewis v. Barnhardt*, 285 F.3d 1329, 1331 (11th Cir. 2002); *see also Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1185 (11th Cir. 1997) ("In construing a statute we must begin, and often should end as well, with the language of the statute itself.").  The Appellees assert that the language of § 1324 restricts its application to individuals who are in the business of smuggling illegal aliens into the United States for employment or those who employ illegal aliens in "sweatshops."  We disagree. Section 1324 applies to "[a]ny person" who knowingly harbors an illegal alien. Although § 1324 and § 1324a appear to cover some of the same conduct, "the fact that Congress has enacted two sections encompassing similar conduct but prescribing different penalties does not compel a conclusion that one statute was meant to limit, repeal, or affect enforcement of the other."  *United States v. Kim*,

---

[3] Section 1324a provides a civil penalty, not to exceed $3000, for each unauthorized alien and a criminal penalty, not to exceed six months, for the entire pattern or practice of employing illegal aliens.

193 F.3d 567, 573 (2d Cir. 1999).  The Supreme Court has noted that statutes may "overlap" or enjoy a "partial redundancy," *United States v. Batchelder*, 442 U.S. 114, 118, 99 S.Ct. 2198, 2201, 60 L.Ed.2d 755 (1979), and yet be "fully capable of coexisting." *Id.* at 122, 99 S.Ct. at 2203.  We agree with the Second Circuit's analysis of §§ 1324 and 1324a that "nothing in the language of these two sections . . . preclude[s] their coexistence." *Kim*, 193 F.3d at 573.  The plain language of § 1324 does not limit its reach to certain specific individuals, and thus, the Government properly charged the Appellees with violating this statute.

We must also examine the other pertinent language Congress used in § 1324. This section provides for a ten-year imprisonment term for any person who knowingly harbors an illegal alien for commercial advantage or private financial gain.  8 U.S.C. § 1324(a)(1)(B)(i).  The statute fails to specifically define "commercial advantage" or "private financial gain," but the meanings of these terms are hardly arcane.  Terms that are not statutorily defined are ascribed their "ordinary or natural meaning." *Nat'l Coal Ass'n v. Chater*, 81 F.3d 1077, 1081 (11th Cir. 1996) (per curiam) (citing *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 476, 114 S.Ct. 996, 1001, 127 L.Ed.2d 308 (1994)); *see also United States v. Stewart*, 311 U.S. 60, 63, 61 S.Ct. 102, 105, 85 L.Ed. 40 (1940) (assuming that Congress used a word in its usual and well-settled sense).  We therefore look to

11

other sources and common sense to aid in the interpretation of these terms. *See United States v. Porter*, 591 F.2d 1048, 1053 (5th Cir. 1979).[4]

The usual meaning of "commercial" is "of, in, or relating to commerce." WEBSTER'S NEW INT'L DICTIONARY (3d ed. 1986). Commerce is defined as "the exchange or buying and selling of commodities esp. on a large scale." *Id.* The word "advantage" signifies "a more favorable or improved position or condition;" a "benefit, profit, or gain of any kind." *Id.* Thus, a common-sense understanding of "commercial advantage" is a profit or gain in money obtained through business activity.

Furthermore, we must ascribe an ordinary meaning to the phrase "private financial gain." Private is ordinarily "intended for or restricted to the use of a particular person or group or class of persons." WESTER'S NEW INT'L DICTIONARY. Financial is defined as "relating to finance," which in turn is defined as "the obtaining of funds or capital." *Id.* A gain is considered "an increase in or addition to what is of profit, advantage, or benefit." *Id.* Accordingly, the common meaning attributed to "private financial gain" is an additional profit specifically for a particular person or group.

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

12

Applying a common meaning to the plain language of the terms Congress used in § 1324 to the Government's evidence presented at trial, a rational jury could conclude beyond a reasonable doubt that the Appellees harbored the illegal aliens for their private financial gain. At trial, the Government proffered evidence that the Appellees provided both employment and housing for the illegal aliens without any evidence that they did so "out of any feelings of charity or affection." *Kim*, 193 F.3d at 577. The Government showed that the Appellees harbored the illegal aliens by providing both housing and employment which facilitated the aliens' ability to remain in the United States illegally. The housing and employment prevented government authorities from detecting the illegal aliens' unlawful presence. *Kim*, 193 F.3d at 574; *see also United States v. Singh*, 261 F.3d 530 (5th Cir. 2001) (affirming a conviction for harboring illegal aliens for commercial gain where defendants employed illegal aliens in a convenience store and the aliens lived in the back of the store).

Moreover, in this case, the Appellees admitted that they obtained workers from an employment agency that specifically recruited aliens. The Government showed that the Appellees gained financially by employing those aliens and paying lower wages, on average, $4.00 an hour for ten hours each day of work. The Appellees also gained financially when they employed these aliens by failing to

13

withhold federal taxes and Social Security payments, failing to pay unemployment taxes, failing to pay the employer's portion of Social Security payments, and wire-transferring more than $200,000 in unreported cash to China. Furthermore, the Appellees greatly under-reported the number of employees, the amount of wages paid to employees, their personal income, and their business income on their infrequently filed tax forms/returns. No doubt exists that the Appellees harbored these illegal aliens for private financial gain when they paid undocumented, unreported, and unlisted illegal aliens a total of $10,000 to $15,000 cash each month without deducting federal withholding tax, FICA, and Social Security contributions.

Although we conclude that the plain language of § 1324 supports the Government's charges, we also note that the evolution of the statute to its present form indicates that Congress intended for this statute to cover employers such as the Appellees. The foundation of § 1324 was Congress' acknowledgment that there was a severe problem with the employment of illegal aliens. In 1986, Congress passed the Immigration Control and Legalization Amendments Act, which revised 8 U.S.C. § 1324(a). Immigration Reform and Control Act of 1986 ("IRCA"), Pub.L. No. 99-603, §§ 101, 112(a), 100 Stat. 3359, 3360-74, 3381-82 (1986). IRCA was a major immigration reform initiative designed to "deter aliens

14

from entering [the United States] illegally." H.R. Rep. No. 99-682(I), at 46 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5650. Noting that the "primary reason for the illegal alien problem is the economic imbalance between the United States and the countries from which aliens come, coupled with the chance of employment in the United States," the House Committee was of the opinion that the most reasonable approach to the problem was to make unlawful the "knowing" employment of illegal aliens. 1986 U.S.C.C.A.N. at 5656.

Later, Congress amended the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA"), Pub.L. 104-208, 110 Stat. 3009-565, to provide the increased penalty of ten years for a violation of § 1324(a)(1)(A)(i), (ii), (iii), or (iv) (offenses relating to alien smuggling, harboring, inducement, or transportation) done for the purpose of commercial advantage or private financial gain.

The legislative history demonstrates that Congress intended § 1324 to cover employers such as the Appellees. Congress expressly noted the pervasive problem of illegal alien employment and its harmful effect on the American worker. Each time an employer hires an illegal alien, an American citizen loses an employment opportunity. Congress understood this problem and chose to penalize employers for hiring illegal aliens and harboring them from detection by providing

15

transportation and housing for them.  In light of the Congressional purpose of this statute, the Appellees are not immune from its reach.

In conclusion, we are persuaded that the Government provided sufficient evidence from which a rational jury could conclude beyond a reasonable doubt (and did so conclude) that the Appellees' harboring of illegal aliens was for the purpose of commercial advantage or private financial gain.  Accordingly, we reverse the district court's judgments of acquittal and remand with instructions that the district court reinstate the jury's verdict.

REVERSED and REMANDED.