[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-15494
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 24, 2011
JOHN LEY
CLERK

D.C. Docket No. 3:10-cr-00051-LC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DOUGLAS E. LEIGHTEY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(June 24, 2011)

Before TJOFLAT, EDMONDSON and KRAVITCH, Circuit Judges.

PER CURIAM:

A Northern District of Florida jury convicted Douglas E. Leightey of all

charges in an indictment: Count One, use of a computer to attempt to persuade,

induce, entice and coerce a minor to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(b); Count Two, travel in interstate commerce with the intent to engage in a sexual act with a person under the age of twelve, 18 U.S.C. § 2241(c); Count Three, use of a computer to attempt to transfer obscene matter to a minor, in violation of 18 U.S.C. § 1470. The district court sentenced Leightey to concurrent prison terms of 12 months on Counts One and Three and 360 months on Count Two. He now appeals his convictions and his Count Two sentence.

Leightey challenges his convictions on the ground that the evidence was insufficient to convict because he was entrapped as a matter of law. The court therefore erred in denying his motion for judgment of acquittal. Leightey challenges the Count Two sentence, the minimum sentence prescribed by statute, on several grounds: (1) it violates the Eighth Amendment prohibition against cruel and unusual punishment as applied to the facts of his case; (2) it is disproportionate when compared to state law sentences for attempted child sex crimes; (3) it is invalid under *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), which, according to Leightey, bars mandatory minimum sentences; and (4) it is unconstitutional because it deprived the district court from exercising its discretion, *Greenlaw v. United States*, 554 U.S. 237, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008).

We review a challenge to the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the government. *United States v. Jones*, 601 F.3d 1247, 1267 (11th Cir. 2010). Resolving all credibility choices in support of the jury's verdict, we decide "whether the evidence. . .was sufficient to support the jury's conclusion that the defendant was guilty beyond a reasonable doubt." *Id*. We also apply a *de novo* standard of review to a court's denial of a motion for judgment of acquittal. *United States v. Zheng*, 306 F.3d 1080, 1083 (11th Cir. 2002).

The affirmative defense of entrapment "applies when a person not predisposed to commit a crime is induced to do so by the government." *United States v. Sistrunk*, 622 F.3d 1328, 1332 (11th Cir. 2010), *cert. denied*, 131 S.Ct. 1529 (2011). There are two elements to an entrapment defense: "(1) government inducement of the crime; and (2) lack of predisposition on the part of the defendant." *Id.* at 1333. The defendant bears the initial burden of production of evidence of government inducement; once he meets that burden, the government must prove beyond a reasonable doubt that he was predisposed to commit the crime. *Id.* When the jury rejects a defendant's entrapment defense, our review is limited to "whether the evidence was sufficient for a reasonable jury to conclude

that the defendant was predisposed to take part in the illicit transaction." *United States v. Padron*, 527 F.3d 1156, 1159 (11th Cir. 2008).

Viewing the evidence in the light most favorable to the Government, we conclude the jury had an adequate basis for finding that Leightey was predisposed to engage in the conduct with which he was charged. This is how the offenses alleged in Counts One through Three came about.

A Pensacola, Florida, police officer, Christopher Wilkinson, was attached to Immigration and Customs Enforcement ("ICE") as an undercover investigator of computer crimes involving children. Wilkinson established a Yahoo! chat room profile for his investigation. Posing as a "dirty parent,"[1] he stated that his name was Mike Johnson, that he was 49 years old, that he had an eight-year-old son and a ten-year old daughter, and that his favorite movies were "Pretty Baby" and "Lolita," movies that portrayed adults having sex with children. Under "interests," he stated, "I like[] to talk with like-minded parents about how to properly instruct an eight and ten year old boy and girl at ways to develop meaningful relationships, to please email me if you're like-minded."

---

[1] Wilkinson described "dirty parents" as "a phenomenon where parents swing with other parents and their children, and so they have sex with each other's children."

A person with the screen name Sidney Glomp, who turned out to be Leightey,[2] contacted Wilkinson by Yahoo! instant messaging on December 3, 2009.  Leightey indicated that he would be visiting Pensacola in March and asked about Wilkinson's family.  Wilkinson told Leightey that he was 49 and his wife was 29, and that they had a boy who was eight and a girl who was ten.  Leightey attempted to communicate with Wilkinson  numerous times in December 2009 and January 2010, but Wilkinson was not online on these dates.

In an online conversation on February 8, 2010, Leightey indicated that he was preparing for his March trip to Pensacola and was having troubles making other friends for the trip, because "[t]hey say it takes time to gain trust before they meet."  Leightey then asked what Wilkinson's kids' ages were, and Wilkinson told him that his son was eight and his daughter eleven.  The following conversation ensued:

[Wilkinson:] Are you looking for family fun or just swinging? ...

[Leightey:] Family fun.  By family fun, just what do you mean?
Swinging I do understand.

[Wilkinson:] Families that play together.

[Leightey:] I have talked to some with different meanings.  To play,

---

[2] Wilkinson was able to determine that Glomp was actually Douglas E. Leightey of Carey, Ohio.

you do mean contact?

[Wilkinson:] I guess you can say we swing as a family with other families.

[Leightey:] Where kids are involved?  Talked to one man who says kids are off limits until 18 no matter what. ... Talked to one man who said 17 is their limits.

[Wilkinson:] Well, we never force anything, but if the kids want to play, we let them, as long as everyone understands what the word "no" means.

[Leightey:] Fair. ... I talked to one who says that girls at any age get to sit on his lap.

[Leightey:] I am not looking for any contact.  Just want to be there.  Would be so hot.  I know I will get a woody just being there.

[Wilkinson:] Fair enough.  But what do you mean, just watch us have sex or what?

[Leightey:] And I wonder what kind of looks I will have from them being a stranger if I am accepted.  I'd love to join in on the sex if it happens I am accepted. [If] not, that is good, too.  Just to be a part.  I do understand lone males are not really accepted.

[Wilkinson:] Well, my son usually ain't interested.  He's still a little young.  But my daughter likes to play.

[Leightey:] [Now] that does interest me.  She likes to sit on laps?

[Wilkinson:] LOL.  It's okay.  She's never done intercourse.  She is trying to, but she is still a little small down there, but she likes touching and being touched.

[Leightey:] Touching is what I want – I am interested in, if allowed to

6

join in.

...

[Wilkinson:] Have you ever been with a little one before?

[Leightey:] No.  And I wonder about it.

[Wilkinson:] Honestly, you may be more happy with just straight swinging with other adults.

[Leightey:] Little ones more fun?  I wonder if they are.

[Wilkinson:] [They] are different and more energetic and eager to learn new stuff and they love the attention.

[Leightey:] I bet they do.  But they may be cautious of a stranger and avoid.

[Wilkinson:] But it's different than with adults.  You need to know how to talk to them and reassure them and stuff.

[Leightey:] Coax them in a way?

[Wilkinson:] That's why I say if you've never done it before, you probably should stick with other adults.

[Leightey:] May be, but thanks for filling me in.  I think I am just too anxious maybe, and I should not try it while I am a stranger to them.

Leightey and Wilkins talked again via online chat on March 17, 2010.  In that conversation, Leightey told Wilkinson that he was coming to Pensacola on April 23, 2010, and that it "[w]ould be nice to spend time with you guys." On this occasion, Leightey and Wilkinson had the following conversation:

7

[Leightey:] Well, it will be my first time, remember, and I think I do understand things pretty good.

[Wilkinson:] A newbie, hugh?

[Leightey:] Yes. You like newbies.

[Wilkinson:] You mean about kids?

[Leightey:] Yes, I understand that pretty good, but new to being naked with a family also.

[Wilkinson:] Well, it's not that bad once you get used to it.

[Leightey:] I hope not. LOL. I should get used to it fast since I want to try it. That does make a difference. Only hope I fit in.

On April 12, 2010, Leightey provided Wilkinson with his email address, and the two began communicating via email as well. Wilkinson sent Leightey two photographs of himself and Shannon Fortenberry, who was undercover as his wife, by email.

Leightey and Wilkinson also had an internet chat where Leightey used a web camera and undressed in front of it. As Leightey undressed, Wilkinson told him that his daughter had come into the room. In response to Leightey's question regarding whether he should stop undressing, Wilkinson said, "[It] does not matter to me. She's smiling." Leightey and Wilkinson then had the following exchange.

[Leightey:] How old is April?

[Wilkinson:] She is 11. ... Going on 21.

[Leightey:] LOL.  Kids.

[Wilkinson:] Yes.

[Leightey:] She does something to me.  LOL.

[Wilkinson then tells Leightey that his daughter April is sitting on his lap.]

[Leightey:] April is?

[Wilkinson:] LOL.  I hope it's good.

[Leightey:] So she seen me naked?  I do hope it is good.

[Wilkinson:] April?  Yes.  She's right here.

[Leightey:] I hope I can do her good.

[Leightey:] Say, when I am there, would April hold the soap for me?

[Wilkinson:] She is smiling.  I think that means yes.  LOL.

[Leightey:] Okay.  And I'll hold it for her if she wants.  I'll wash her back, too.

[Wilkinson:] She is a proud girl now.

[Leightey:] She is?  Did she come of age?

[Wilkinson:] She went all the way with her daddy about two weeks.

[Leightey:] Cool.  So now she's daddy's girl.  Did you see that?

During the conversation, Wilkinson could see on the web camera that Leightey's penis was erect, and that he was masturbating. The conversation between Leightey and Wilkinson continued:

[Leightey:] As soon as you said that, I got hard. LOL.

[Wilkinson:] She is really smiling now. She wants to know if you like to kiss down there.

[Leightey:] You mean on her?

[Wilkinson:] She says yes.

[Leightey:] Okay. Do I like to kiss there? Yes, I do like that. Got me hard again asking that. LOL. See that?

Leightey also told Wilkinson that he had "[d]ecided this time on vacation I wanted to have some really good fun." Prior to ending the chat, Leightey told Wilkinson to tell April goodbye and that he would see her soon.

Leightey and Wilkinson thereafter exchanged emails regarding Leightey's plan to visit Pensacola. On April 22, 2010, they met at a Dairy Queen across from a Ramada Inn in Pensacola. Shannon Fortenberry, an undercover detective, accompanied Wilkinson, posing as his wife. During the conversation that followed, they discussed how Leightey's sexual encounter with April would begin. Leightey interjected that he knew how the encounter

10

would proceed. As the conversation grew to a close, Leightey stated that he would check into the Ramada Inn, go to Walgreens and buy a Webkinz doll and to an adult novelty store to purchase something for Wilkinson's wife and April before meeting with them at the hotel. At that point, Wilkinson signaled other agents and Leightey was arrested.

In addition to what we have set out above, the jury received other evidence of Leightey's predisposition to engage in the illicit conduct. Some of this evidence was in the form of Leightey's admissions—that Leightey had been involved in conversations with other families regarding the possibility of having sex with their children. Wilkinson did not try to entice or persuade Leightey to have sex with April. At one point, he gave Leightey an "out" by suggesting that Leightey should stick with adults instead of children. Yet, Leightey persisted. In sum, we find no error in the district court's denial of Leightey's motion for judgment of acquittal.[3]

II.

We review a defendant's constitutional challenge to his sentence *de novo*.

---

[3] Leightey asserts that his convictions should be reversed because an actual child was not involved in the case. Our precedent makes clear that an actual child is not necessary. *See United States v. Farley*, 607 F.3d 1294, 1325 (11th Cir.), *cert. denied*, 131 S.Ct. 369 (2010).

*United States v. Rozier*, 598 F.3d 768, 770 (11th Cir. 2010). Where a party has failed to preserve an objection to the sentence after being offered the opportunity to do so, any objection is waived and we will not address the objection unless the failure to do so would result in manifest injustice. *United States v. Canty*, 570 F.3d 1251, 1256 (11th Cir. 2009). We equate manifest injustice with the plain error standard of review. *United States v. Quintana*, 300 F.3d 1227, 1232 (11th Cir. 2002). "To demonstrate manifest injustice, a petitioner must demonstrate (1) that there was error; (2) that was plain; (3) that affected his substantial rights; and (4) that affected the fundamental fairness of the proceedings." *Id.*

Although Leightey raised his Eighth Amendment claim in his motion to dismiss the indictment, he failed to raise it at his sentencing hearing Hence, we review his claim for plain error only. In *United States v. Farley*, we rejected the same argument that Leightey makes here, holding that the 30-year minimum mandatory imposed under 18 U.S.C. § 2241(c) is not constitutionally disproportionate to the offense and thus does not violate the Eighth Amendment. *See* 607 F.3d 1294, 1343-45 (11th Cir. 2010). Because Leightey's argument contradicts our precedent, the district court did not err in imposing Leightey's 30-year sentence.

Finally, Leightey asserts that the 30-year minimum mandatory sentence for Count Two violates the Sixth Amendment. Again, Leightey has waived all but plain error.

Nothing in *Booker* or *Greenlaw* supports Leightey's argument that district courts cannot impose statutory mandatory minimum sentences. Furthermore, in *United States v. Castaing-Sosa*, 530 F.3d 1358 (11th Cir. 2008), we specifically held that district courts remain bound by statutory mandatory minimums in sentencing, noting that *Booker* applied to the Sentencing Guidelines, not to statutory mandatory minimums. *Id.* at 1362. Since Leightey's argument is contrary to our precedent, the district court did not err in imposing Leightey's 30-year sentence.

AFFIRMED.