# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-40175

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ARACELI GARCIA,

Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

February 22, 2018

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Southern District of Texas

Before REAVLEY, SMITH, and OWEN, Circuit Judges.

REAVLEY, Circuit Judge:

A jury convicted Araceli Garcia of bringing unlawful aliens into the United States for the purpose of commercial advantage or private financial gain, a violation of 8 U.S.C. § 1324(a)(2)(B)(ii). Garcia appeals her conviction, arguing only that the Government failed to prove that she acted with the requisite financial purpose. We conclude, however, that the totality of the evidence allowed the jury to reasonably infer such a purpose. Garcia's conviction is affirmed.

## I.    BACKGROUND

On May 13, 2016, a Cadillac Escalade travelled from Mexico and arrived at the Lincoln-Juarez Bridge, which serves as a port of entry into the United

No. 17-40175

States by way of Laredo, Texas. Araceli Garcia (the owner of the vehicle) sat in the passenger's seat, her 17-year-old daughter was the driver, and five or six other children occupied the vehicle's remaining seats.

United States Customs and Border Protection Officer Andrew Lewinski approached the vehicle, and Garcia informed him that the vehicle was overheating. Yet, Lewinski observed that the vehicle's air conditioning was running full blast, no warning lights appeared on the dash, and none of the vehicle's occupants were sweating. As for the group's itinerary, Garcia explained that her daughter and grandchildren drove from Houston toward Monterrey to visit family, but upon discovering that the Monterrey relatives were not home, the family turned around to stay with other relatives in Laredo. This explanation was dubious, too, given the vehicle's lack of luggage.

Lewinski then collected identification documents (birth certificates, passports, etc.) from each person in the vehicle, and he began to read aloud the names to match the documents to the passengers. Two of the child passengers responded to names found on a pair of Texas birth certificates: Stephanie Soto and Adrian Soto. But a brief investigation called into question the validity of those identities; neither child spoke English, and "Stephanie" misspelled the name on her purported birth certificate. Ultimately, officers discovered that "Stephanie" was in reality D.I.P.M. and "Adrian" was M.G.M.—both Mexican siblings and both without prior permission to come into the United States.

A grand jury indicted Garcia on two counts of bringing unlawful aliens into the United States for the purpose of commercial advantage or private financial gain in violation of 8 U.S.C. § 1324(a)(2)(B)(ii). At trial, several officers explained the factual circumstances of the offense. And, importantly, D.I.P.M. herself shed further light on the smuggling endeavor. D.I.P.M. confirmed that arrangements were in place to smuggle her and her brother into the United States and that Garcia was the person designated to do so.

No. 17-40175

D.I.P.M. was not related to Garcia and had never seen her before meeting for the first time in Nuevo Laredo, Mexico. There, Garcia supplied the children with the birth certificates and other biographical information to corroborate the false identities. The group's ultimate goal was to cross into Laredo and travel to Garcia's home in Houston. D.I.P.M. and M.G.M. had been living apart from their mother (a New York resident), the logical inference being that the smuggling attempt was meant to reunite the family.

When asked whether Garcia "was going to be paid money in order to have [the children] smuggled into the United States," D.I.P.M. testified: "I only know that she was going to [be] paid the expenses that we would have on the journey." D.I.P.M. learned of this payment from her mother but did not know how much money it entailed.

After the Government rested, Garcia moved for acquittal under Federal Rule of Criminal Procedure 29. The district court denied the motion, the defense rested without calling a witness, and the jury convicted Garcia on both counts. Because the statute of conviction carries a three-year mandatory minimum, the district court sentenced Garcia on each count to three years' imprisonment with a three-year term of supervised release, each sentence to run concurrently. 8 U.S.C. § 1324(a)(2)(B). Garcia appealed, challenging only the sufficiency of the evidence with respect to whether she acted "for the purpose of commercial advantage or private financial gain."

## II.    STANDARD OF REVIEW

In reviewing Garcia's preserved legal-sufficiency challenge, we must affirm her conviction "if, after viewing the evidence and all reasonable inferences in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). At the same time,

No. 17-40175

we remain obligated to evaluate "whether the inferences drawn by a jury were rational, as opposed to being speculative or insupportable, and whether the evidence is sufficient to establish every element of the crime." *Id.* at 302.

## III.   DISCUSSION

Because Garcia does not dispute that she knowingly brought unlawful aliens into the United States, this appeal tasks us with evaluating only the proof of Garcia's financial purpose. In doing so, we must first articulate what "for the purpose of commercial advantage or private financial gain" really means. 8 U.S.C. § 1324(a)(2)(B)(ii). Despite a healthy stream of (mostly unpublished) smuggling cases, this circuit has yet to define the phrase. Indeed, that silence is entirely unsurprising given that nearly every one of those cases involved direct proof of an actual or expected lump-sum payment to either the defendant or the defendant's smuggling network. *See, e.g.*, *United States v. Durant*, 167 F. App'x 369, 370 (5th Cir. 2006) (per curiam) (affirming conviction when unlawful aliens found in defendant's trailer "had agreed to pay between $1,000 and $1,200 upon their arrival in Houston"). When the Government adduced proof of such payments, it mattered not what the precise contours of the definition entailed because the smuggler's prospect of financial gain was readily apparent.

But in this case, the breadth of the financial-purpose element matters insofar as it affects the trajectory of our analysis. If proof of *any* expected payment suffices, then this case is open and shut—D.I.P.M. testified flatly that Garcia was to be paid expenses for their journey. If, however, the monetary expectation must be of a more profit-based character (as Garcia suggests), then this case becomes less straightforward because the Government did not offer direct proof of expected payment beyond that of a pure reimbursement. In turn, Garcia's conviction would stand or fall on the Government's circumstantial evidence and the rational inferences therefrom.

4

No. 17-40175

## A.     "Commercial Advantage" and "Private Financial Gain"

We are not without guidance in defining the terms "commercial advantage" and "private financial gain" in the context of this statute. In *United States v. Zheng*, 306 F.3d 1080, 1085 (11th Cir. 2002), the Eleventh Circuit took up the task and concluded that the meanings of those terms are "hardly arcane." Because Congress left those terms undefined in the smuggling statute, the *Zheng* court looked to "other sources and common sense" in giving the terms their "ordinary or natural meaning." *Id.* (citations omitted). And, as a result, the court defined "commercial advantage" as "a profit or gain in money obtained through business activity" and defined "private financial gain" as "an additional profit specifically for a particular person or group." *Id.* at 1086 (quoting WEBSTER'S NEW INT'L DICTIONARY (3d ed. 1986)); *see also* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 2002) (defining the relevant terms in a nearly identical manner).[1] Garcia suggests we follow in *Zheng*'s footsteps.

We agree, and we now adopt the essence of the *Zheng* court's definition of the financial-purpose element: the defendant must seek to profit or otherwise secure some economic benefit from her smuggling endeavor. *See* 306 F.3d at 1085–86. But what does that mean as a practical matter? Relevant to this case, it means that the Government must prove an anticipated gain beyond that of a pure reimbursement. A smuggler who seeks only her incurred smuggling costs seeks no economic benefit at all—she simply aims to maintain her financial status quo of zero dollars spent.[2]

---

[1] The Second Circuit, too, has defined the phrase "commercial advantage" in largely the same way. *See United States v. Kim*, 193 F.3d 567, 577 (2d Cir. 1999).

[2] The Government cites *United States v. Puac-Zamora*, 56 F.3d 1385, 1385 n.3 (5th Cir. 1995) (per curiam) (unpublished), for the proposition that a reimbursement can constitute financial gain when the smuggler was already "traveling to [the intended destination] with or without the illegal alien passengers" because, in that scenario, the

No. 17-40175

However, this is not at all to say that financial gain must necessarily take the form of cash placed directly in the smuggler's pocket. One could conceive of plenty of circumstances in which a smuggler hopes to secure a less traditional (but equally pecuniary) benefit. *See*, *e.g.*, *United States v. Fujii*, 301 F.3d 535, 540 (7th Cir. 2002) (finding the "pecuniary motive" element satisfied when the smuggler acted to satisfy a pre-existing debt). Resolving this case does not require us to hypothesize the outermost edges of the financial-purpose universe.

The Government offers little resistance to the benefit-centric definition we outline above. Instead, the Government simply contrasts *Zheng*'s definition with a statutory definition found in the context of another crime. Specifically, the Government cites 18 U.S.C. § 2320, which criminalizes trafficking counterfeit goods "for purposes of commercial advantage or private financial gain" and defines "financial gain" as "includ[ing] the receipt, or expected receipt, of anything of value"—a definition the Government presumably views as more expansive. 18 U.S.C. § 2320(f)(2). But the Government's citation appears without elaboration. The Government does not demonstrate why we should use a definition specific to another crime to interpret a phrase Congress left undefined in the statute before us. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 172–73 (2012) (explaining that, without more, "[t]he mere fact that the [same] words are used in each instance is not a sufficient reason for treating a decision on the meaning of the words of one statute as authoritative on the construction of another statute") (citation omitted). And, more fundamentally, the Government fails to explain why the

---

"reimbursement" is actually money gained. We do not question *Puac-Zamora*'s logic. Our resolution of this appeal, however, is based on other evidence and does not require us to decide if Garcia's itinerary testimony would be sufficient to support the conviction even though the Government tried the case on the theory that this testimony was false.

phrase "expected receipt, of anything of *value*" is meaningfully different from the definition we adopt. "Value," after all, is "the monetary worth of something." *Value*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 2002). When someone performs a service and expects in return only a reimbursement for incurred costs, she has not acted for the purpose of receiving anything of worth—she expects, on balance, to receive no "value" at all for her services.

Therefore, whichever terminology we employ, the inescapable definitions of "commercial advantage" and "financial gain" relate to a pecuniary benefit: the goal of improving one's economic status in one way or another. It is to that standard we must now hold the Government.

**B.    Inferring Financial Purpose from the Evidence**

Now that we have clarified the financial-purpose element, Garcia suggests we can stop here. In other words, because pure reimbursements do not qualify, and because the Government's testimony indicated only a promise to reimburse, Garcia argues the record contains no evidence of a profit-based motive. Given our preceding analysis, we agree with Garcia that D.I.P.M.'s testimony about travel expenses does not, by itself, satisfy the Government's burden. But we disagree with Garcia's suggestion that the jury could not reasonably infer financial purpose from the quantum of the Government's circumstantial proof.

First, we bear in mind that the statute does not confine itself to smuggling that results in *actual* commercial advantage or financial gain; it criminalizes smuggling undertaken "for the purpose" of such gains. 8 U.S.C. § 1324(a)(2)(B)(ii). Thus, the financial-purpose element is of a prospective, intent-based character. *See United States v. Bailey*, 444 U.S. 394, 405 (1980) ("'[P]urpose' corresponds loosely with the common-law concept of specific intent."). And, a defendant's "mental state is almost always proved by

circumstantial evidence from which the jury must infer guilt beyond a reasonable doubt." *United States v. Giraldi*, 86 F.3d 1368, 1374 (5th Cir. 1996).

The question becomes: what kind of circumstantial evidence must we require? The very best circumstantial evidence of a defendant's purpose is, of course, testimony that the defendant (1) planned to achieve some result or (2) in fact secured some objective—in terms of this case, testimony of an agreement to pay or an actual payment. But our jurisprudence simply does not require such evidence for a jury to draw the necessary inference.

Take, by way of analogy, a prosecution for possession of drugs with intent to distribute. There, the best evidence of intent is naturally an agreement to distribute or evidence of the distribution itself. *See United States v. Chapman*, 851 F.3d 363, 379 (5th Cir. 2017) (inferring intent to distribute from evidence "that [the defendant] himself distributed drugs to buyers"). But we nevertheless allow a jury to draw the inference from other, more indirect circumstantial indicators. *See, e.g., United States v. Williamson*, 533 F.3d 269, 277–78 (5th Cir. 2008) ("We have held in the past that the mere possession of a quantity of drugs inconsistent with personal use will suffice for the jury to find intent to distribute.") (quotation omitted); *United States v. Munoz*, 957 F.2d 171, 174 (5th Cir. 1992) (finding "distribution paraphernalia, large quantities of cash, or the value and quality of the substance" probative of intent).

In short, whatever the context, a defendant's purpose often goes hand in hand with certain suspicious circumstances, and we do not forbid jurors from drawing rational connections between the two. We therefore agree with our sister circuits that have decided the Government need not prove "an 'actual payment or even an agreement to pay'" to satisfy the financial-purpose element. *United States v. Kim*, 435 F.3d 182, 185 (2d Cir. 2006) (per curiam) (quoting *United States v. Angwin*, 271 F.3d 786, 805 (9th Cir. 2001)).

Consequently, the fact that D.I.P.M. did not testify to an agreed-upon, profitable payment does not end our inquiry.

Turning to the record before us, we find sufficient circumstantial indicators of Garcia's pecuniary motive. First, and most important, the jury was free to infer that Garcia bore no relation (familial or otherwise) to the smuggled children. D.I.P.M. testified that she was not related to Garcia; nor had the two met before the day of the smuggling. Garcia points out that D.I.P.M. did not know all of her mother's acquaintances, and in turn, the Government "could not rule out that Ms. Garcia was acting out of friendship [with the mother] rather than financial motive." Yet, D.I.P.M. did know some of her mother's friends and was nonetheless wholly unfamiliar with Garcia. And, in any event, the evidence "need not exclude every reasonable hypothesis of innocence." *United States v. Gibson*, 875 F.3d 179, 185 (5th Cir. 2017) (quotation omitted). Rather, the jury was free to choose among reasonable constructions of the evidence, including that Garcia was unrelated to and unacquainted with D.I.P.M.'s family.

This lack of connection between Garcia and the smuggled children undercuts the exculpatory inference that Garcia acted for a charitable, non-pecuniary purpose, thereby making the contrary financial motive all the more probable. Multiple courts (this one included) have recognized as much. *See, e.g., United States v. Yoshida*, 303 F.3d 1145, 1152 (9th Cir. 2002) ("Yoshida, as a stranger to the aliens, had no benevolent reason to lead them into the United States. It was reasonable for the jury to infer that Yoshida expected some payment for her role in leading the aliens . . . ."); *United States v. Lopez-Cabrera*, 617 F. App'x 332, 336 (5th Cir. 2015) (per curiam) (listing the fact that "[n]one of the immigrants Cabrera transported had any personal relationship with Cabrera" among the circumstantial evidence probative of a financial purpose). And this logic is not unique to the smuggling context either;

just as a large quantity of drugs negates the exculpatory inference of personal consumption and lends itself to an intent to distribute, *Williamson*, 533 F.3d at 277–78, when someone smuggles a stranger, a rational inference is that she does so for compensation, *Yoshida*, 303 F.3d at 1152.

Second, the nature of Garcia's offense is itself probative of an intent to profit. Garcia's smuggling was by no means a casual undertaking. To the contrary, the trial evidence confirmed that Garcia's operation was premeditated, complete with an international journey, false identities, cover stories, and Texas birth certificates to legitimize the facade. The jury could reasonably infer that this level of planning and coordination was more consistent with that of a professional, financed operation than an amateur, philanthropic one. *See United States v. Allende-Garcia*, 407 F. App'x 829, 835 (5th Cir. 2011) (unpublished) ("The coordination and planning that was required for transporting a number of aliens, using a raft, a house, two cars, and a truck, could lead a reasonable jury to infer that a smuggling network was moving the aliens . . . ."). Furthermore, Garcia carried out the smuggling at great risk of legal consequences, not only to herself but to her 17-year old daughter in the driver's seat. Such risk, when unexplained, further buttresses an inference of pecuniary motive. *See id.* (noting that the defendant "did not advance at trial any alternative, non-pecuniary explanation of why he would risk being caught, losing his job, and going to prison for transporting the aliens").

Finally, we reach D.I.P.M.'s testimony about a payment for expenses. True, this expected reimbursement does not meet the Government's burden of proof on its own. But the payment does provide an important piece of the circumstantial equation: Garcia's smuggling operation had a financer, someone who was ready and willing to contribute money to facilitate the operation's success. D.I.P.M. did not profess exhaustive knowledge of the

financial arrangements; she "only kn[e]w" about the reimbursement. Thus, the jury could simultaneously credit D.I.P.M.'s testimony and nevertheless infer—given the circumstantial indicators recognized above—that Garcia sought compensation from the unknown financer beyond that of a mere reimbursement.

This body of evidence differs markedly from Garcia's best case, *United States v. Garza*, 587 F.3d 304 (5th Cir. 2009) (per curiam). There, despite the fact that the defendant pleaded guilty only to smuggling unlawful aliens under 8 U.S.C. § 1324(a)(1)(B)(ii) (a lesser crime that does not require a pecuniary motive), the district court erroneously entered judgment for smuggling with a financial purpose. *Id.* at 311–12. On appeal, both sides *agreed* that "no financial gain motive was established," and the record confirmed why: two aliens approached the defendant at a gas station and asked her for a ride, the defendant claimed she had not discussed payment with the men and expected no compensation in return for her assistance, and, importantly, the "record suggest[ed] that the men had no ability to pay and actually asked Garza for money before asking for a ride." *Id.* at 307, 312. Thus, not only did the record contain a non-pecuniary explanation for the defendant's assistance, any conceivable financial inference was nullified by the aliens' unwillingness and inability to pay. *See id.* at 312. Quite the opposite here. The evidence below gave the jury an impression of both financial motive and the existence of a financial source, and the jury heard absolutely nothing to suggest otherwise.

At the end of the day, "[j]urors need not leave their commonsense on the courthouse steps." *Williamson*, 533 F.3d at 278. Though the Government's circumstantial evidence was not overwhelming, we cannot conclude that the only reasonable inference therefrom was that Garcia desired to perform her smuggling service for free. Nor can we conclude that the contrary financial inference was unduly speculative. In so deciding, we do not evaluate the

No. 17-40175

hypothetical sufficiency of any one piece of the Government's circumstantial evidence. We can only judge the case before us, and the confluence of evidence in this case was sufficient to sustain Garcia's conviction.

AFFIRMED.